566 P.2d 297

**Meldrum HARVEY, M.D., and Jane Doe Harvey, his wife, Appellants,**

**v.**

**Sandy KELLIN and Hillary Kellin, his wife, Appellees.**

**No. 12659.**

Supreme Court of Arizona, In Division.

June 6, 1977.

Jones, Teilborg, Sanders, Haga & Parks by Frank A. Parks, Phoenix, for appellants.

Stark & Wood by Rod Wood, Phoenix, for appellees.

**STRUCKMEYER, Vice Chief Justice.**

Meldrum Harvey, M.D., appeals from a judgment entered on a jury's verdict which found him negligent in treating injuries sustained by Sandy Kellin in a boating accident on Lake Havasu. Jurisdiction was assumed pursuant to Rule 47(e), 17A, A.R.S., Rules of the Supreme Court. Judgment of the Superior Court affirmed.

Dr. Harvey first questions the sufficiency of the evidence to support the judgment, contending that Kellin failed to establish a prima facie case of negligence in that there was not sufficient evidence to establish a standard of care and a deviation therefrom. He also contends that Kellin failed to establish the asserted negligence as the proximate cause of Kellin's injuries.

■ On appeal, the evidence on the issue of negligence is viewed in a light most favorable to the prevailing party at the trial. *E. L. Jones Construction Co. v. Noland*, 105 Ariz. 446, 452, 466 P.2d 740 (1970). As so viewed, the evidence establishes that on September 7, 1972, Kellin sustained a transverse fracture to the right tibia when the power boat he was testing became airborne and disintegrated. Kellin was taken to a marina dock where an air splint was placed on his leg. He was transported to Dr. Harvey's offices in Lake Havasu City where his leg was initially examined. He was then taken to the Needles Municipal Hospital in Needles, California, where a plaster cast was placed on his leg from the foot to the upper thigh.

Kellin could move all his extremities when first examined by Dr. Harvey at his Lake Havasu City office. He telephoned Harvey four days after the reduction to complain of pain and certain pain pills were prescribed. Kellin testified that he was still under a lot of pain and that he sweated at night and was unable to sleep. He saw Dr. Harvey on September 15, 1972, but was not physically examined by him at this time. On the 20th of September, Kellin again saw Dr. Harvey and told him that he was experiencing a tingling in his toes. Dr. Harvey just told him to keep the foot elevated. Kellin testified he was unable to dorsiflex his foot on the 27th of September when he again saw Harvey, and that he told him on October 4th or 5th about the numbness he was experiencing in his right foot. He testified that by October 18th he was unable to extend his toes. His testimony was to the effect that Dr. Harvey would reassure him on these visits that "it would all work out in therapy."

On October 28th, Dr. Harvey removed and replaced the cast, but did not ask Kellin to dorsiflex or plantarflex his foot. Kellin testified that at this time his foot was dropping severely. He again expressed concern to Dr. Harvey over the numbness in his foot at visits on November 5th and 21st. Finally, on December 5, 1972, Dr. Harvey examined Kellin and determined that he had a definite footdrop.

Dr. Joseph A. Leake, D.O., testified that he visited Kellin a week to ten days after the accident and that Kellin complained then of numbness and pain, and of trouble in moving his toes. He also testified that Kellin was unable to move his toes a month

later. Dr. Leake acknowledged that a possible cause of the damage to Kellin's peroneal nerve could have been by injury sustained in the boat accident. He testified, however, that if the peroneal nerve had been damaged in the boat accident, it would have been possible for Kellin to dorsiflex and plantarflex his foot, but that he would have been unable to move his toes as he did.

Dr. Robert S. Barbosa, D.O., examined Kellin on December 6, 1972, and placed his leg in a cast the following day. He testified that at this time Kellin had peroneal neuropathy of the right peroneal nerve. Dr. Barbosa was of the opinion that no neuro-vascular deficit was present immediately after the injury. He stated that if a person has tingling and pain, a physician should not hesitate to open the cast immediately. He testified that after a fracture is reduced, the possibility of swelling and a snug cast exists, which can cause irritation to a nerve, most commonly the peroneal nerve. For this reason, he felt that a physician should always check for any neurological injury on a follow-up examination.

Hillary Kellin, Kellin's wife, testified that she had a telephone conversation with Dr. Harvey on December 7, 1972. At that time she told him that her husband had gone to Phoenix for other medical opinions concerning his problems. She said she told Dr. Harvey about the trouble her husband was having with numbness and tingling in his toes and that he replied by saying that it would all work out in therapy and that he was not worried. Dr. Harvey's opinion expressed at the trial was that Kellin suffered a stretch injury to the peroneal nerve in the boat accident which did not reveal itself until after October 28, 1972.

In Arizona, a general practitioner in treating a patient must use the degree of skill and learning exercised by general practitioners in the same or a similar community. *Kronke v. Danielson*, 108 Ariz. 400, 403, 499 P.2d 156 (1972). This standard must be shown by affirmative evidence, and a deviation from it must be established by expert medical testimony unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Boyce v. Brown*, 51 Ariz. 416, 421, 77 P.2d 455 (1938); *Riedisser v. Nelson*, 111 Ariz. 542, 544, 534 P.2d 1052 (1975). The standard of care and deviation therefrom can be shown by the testimony of the defendant. *Vigil v. Herman*, 102 Ariz. 31, 34, 424 P.2d 159 (1967); *Stallcup v. Coscarart*, 79 Ariz. 42, 46, 282 P.2d 791 (1955).

The standard of care in Lake Havasu City at the time of appellant's treatment of appellee was testified to by Dr. Arthur A. Arnold, M.D. Dr. Arnold testified that he was a general practitioner in Kingman, Arizona for 26 years; that Kingman and Lake Havasu City are similar communities, both located in Mohave County; that two and a half years prior to the trial, the only hospital in Mohave County was located in Kingman; and that he had treated thousands of long bone fractures. In response to a question as to his opinion of the standard of care in Mohave County in a situation where the tibia is fractured and a long leg cast from the upper thigh region to the bottom of the foot is applied, Dr. Arnold testified:

"The standard would require—first of all, I would like to say the case [sic] should be applied properly.

From then on the advice to the patient is extremely important and probably more important is the observation of the doctor as to the progress of such fracture, which would include the looks of the foot or toes, the part that was left visible, whether it was cyanotic, whether it was high cyanotic, I mean bluish in coloration, whether it was swelling, whether it was white and blanched.

I will explain in a minute why these are important. Whether the sensation is missing, both by pin pricking and by the individual sensation, and other vasomotor, for instance, sweating of the extremity. These are factors that must be watched for, and perhaps I missed the most important of all, pain, excruciating pain after a cast is put on is by far the most important one thing a patient must be warned of, and usually they will tell you about that."

Dr. Arnold testified as to what a general practitioner in Mohave County would do when clinically examining positive reduction after the reduction has been made:

"Yes, I think I understand the question. From the standard of the people in Mohave County, I can't vouch for all that. I will say the standard probably maintained by most of them. Those I have watched and those I have seen, and it's been quite a number. I think we all neglect at times very careful observation of a fracture as I mentioned before. When an individual comes in we casually look at it and probably not accurately enough assess it both from the standpoint of the temperature of the toes, sensitivity of them, the ability to move them, all these things, factors, but this should be done, and the patient warned that even if two days hence, there is no numbness at the time, please notify me.

This is an important thing. I think this is standard; is that what you mean?"

Dr. Harvey testified that he knew when he treated Kellin that a casted extremity had to be watched carefully and that a physician should be careful about problems of circulation, excessive swelling, numbness, tingling, pain, and loss of motor function in any casted extremity. He agreed that this knowledge was basic and fundamental. In referring to a medical treatise, "The Management of Fractures and Dislocations", written by Dr. DePalma, Dr. Harvey stated it was one of the most authoritative texts on the subject matter and that he agreed with the following excerpt:

"Persistent pain under a plaster cast is always indicative of trouble. Always give the patient the benefit of the doubt and uncover the area."

Further, Dr. Harvey testified:

"Q. I will ask you whether you agree with this:

'Edema'—and by the way, that is swelling of the soft tissue?

A. That is correct.

Q. —'pain, cyanosis'—and by the way, that is black and blue, correct?

A. That is correct.

Q. —'numbness and anesthesia'—anesthesia being loss of sensory perception?

A. That is true.

Q. —'are clinical features indicating trouble usually due to circulatory impairment. When any of these are present, split or bivalve the cast promptly.'

You will agree with that as being a truthful statement of medicine?

A. One hundred percent."

And:

"Q. Now, sir, you will then—knowing your testimony now, you will agree, will you not, that the standard of practice of a general practitioner, a general practitioner in Mohave County, treating a casted lower extremity, would be to make inquiry of any kind of neurological deficit or injury during the period of follow-up; correct?

A. It certainly would, sir.

Q. And that is a standard that you yourself met in the treatment of Mr. Kellin's injury because as you have told us on each occasion you made inquiry into his neurological injury and found none?

A. The immediate postinjury period, which is the most significant period of time reference an anterior compartment type syndrome, I would have very specifically questioned him. Possibly by the 28th of October I did not specifically question him on that date, but prior to then I would have, just timewise.

Q. What you are saying is that you would have watched it very closely in this period of time, and more casually in this area here?

A. That is correct."

We think the testimony of Dr. Arnold and Dr. Harvey established the standard of care in this case. The argument that the issue of deviation was improperly submitted to the jury because no one testified that the attention given by Dr. Harvey deviated from the applicable standard of care is without merit. Ample testimony was presented which, if believed by the jury, supports a finding that Dr. Harvey deviated from the applicable standard of care.

To summarize: Kellin testified that when first examined by Dr. Harvey he was able to move all his toes; that he first noticed a tingling in his toes four or five days after the accident; that he mentioned this to Dr. Harvey; that Dr. Harvey did not physically examine him but only asked questions and told him to keep the foot elevated and reassured him that it would all work out in therapy. Kellin testified further that the tingling sensation grew progressively worse—from numbness to an inability to extend his toes; that on his visits to Dr. Harvey he was not asked to dorsiflex or plantarflex his foot and that his foot, by October 28, 1972, was dropping severely. This testimony as to numbness and tingling was corroborated by Kellin's wife and two friends.

Dr. Harvey, on the other hand, testified that he did all that was required by the standard of care in Lake Havasu City in that he tested for neurological damage and found no such damage until December 5, 1972. He testified that he never noticed cyanosis, that Kellin never complained of a tight cast or of numbness or tingling in his foot, and that Kellin did not tell him that his toes "didn't work."

■ Where there is a conflict in the evidence, the weight and credibility to be given the witness is for the jury. *Butler v. Rule*, 29 Ariz. 405, 413, 242 P. 436 (1926). The standard of care in this case is not complex. If the evidence presented by Kellin is believed, as the jury evidently did, then it established negligence in a manner "so grossly apparent that a layman would have no difficulty in recognizing it." *Boyce v. Brown*, supra, 51 Ariz. at 421, 77 P.2d at 457. A deviation from the applicable standard of care is amply supported by the record.

■ A plaintiff must also prove that the defendant's negligence was the proximate cause of his injury. What this means is that a plaintiff must present facts from which negligence and a causal relation may be reasonably inferred. *E. L. Jones Construction Co. v. Noland*, 105 Ariz. 446, 453, 466 P.2d 740 (1970); *Morrison v. Acton*, 68 Ariz. 27, 33, 198 P.2d 590 (1948).

■ In the instant case, the evidence before the jury was conflicting. Dr. Harvey testified that the injury was a stretch injury to the peroneal nerve which occurred during the boat accident. Dr. Barbosa was of a different opinion. In reply to a hypothetical question propounded to him which incorporated Kellin's theory of the case, Dr. Barbosa's opinion was that the injury "was due to the soft tissue swelling, and also a snug-fitting plaster of Paris cast." The jurors could therefore reasonably have concluded that Kellin did feel pain four days after the cast was applied; that this pain was followed by gradual numbness, tingling and loss of sensation which gave notice of impending injury to the peroneal nerve; and that Dr. Harvey was apprised of these symptoms.

■ In this case, as in *Vigil v. Herman*, supra, 102 Ariz. at 35, 424 P.2d at 162, the credibility of the witnesses was at issue and proximate cause was a question to be determined by the jury. The jury could reasonably conclude that the damage to Kellin's peroneal nerve and subsequent footdrop resulted directly from Dr. Harvey's failure to be attentive to the condition of his patient.

■ Dr. Harvey argues that it was error for the trial court to read Marji instruction # 15 to the jury. Marji instruction # 15 pertains to the measure of damages in a civil negligence case and includes damages reasonably probable to be experienced in the future. Counsel objected generally in this manner:

"If Your Honor please. I would only object, reiterating what I said on my motion for directed verdict as to damages in toto on the lack of proximate cause.  * * * *"

We do not think that this objection was specific enough to apprise the court and opposing counsel that Dr. Harvey was objecting to the inclusion of future damages. If it was directed at the Marji instruction # 15, then defense counsel should have indicated in what respects so that the trial

**502**

court could understand the precise reason for the objection. Rule 51(a), 16 A.R.S., Rules of Civil Procedure.

■ Dr. Harvey also contends that it was error not to give his proposed instructions 3 and 4, which stated, respectively, that medicine is not an exact science and that the law does not condemn a physician simply because his efforts prove unsuccessful. The trial court did instruct the jury as to Kellin's burden of proof by affirmative evidence. It correctly stated the law concerning the requisite standard of care, deviation therefrom, and the requirement of proximate cause. We think the instructions which were given properly presented the issues to the jury for its determination.

"While instructions which go to the gist of the action, and are supported by the evidence, must be given, *Casey v. Marshall*, 64 Ariz. 232, 168 P.2d 240 (1946), it is not necessary for the trial judge to instruct on every refinement suggested by counsel. Instructions are not given to aid one side or the other in jury argument. Once the court defines in understandable language the legal principles applicable to a controversy, it is the obligation of counsel, in argument, to discuss the evidence and the applicability of the legal principles to the ultimate facts found by the jury." *Porterie v. Peters*, 111 Ariz. 452, 458, 532 P.2d 514, 520 (1975).

The trial court's refusal to give appellant's requested instructions # 3 and # 4 was not error.

The judgment of the trial court is affirmed.

CAMERON, C. J., and HOLOHAN, J., concur.