595 P.2d 38

Albert A. MATSON, Appellant,

v.

George S. NAIFEH, M. D., Appellee.

No. 13938.

Supreme Court of Arizona,
In Division.

April 19, 1979.

Rehearing Denied May 22, 1979.

Pain & Julian by Fred J. Pain, Harry L. Howe, Phoenix, for appellant.

Jones, Teilborg, Sanders, Haga, Parks & Stephenson by Frank A. Parks, Phoenix, for appellee.

STRUCKMEYER, Vice Chief Justice.

This appeal by Albert Matson is from an unfavorable jury verdict in an action for medical malpractice and from the denial of his motion for a new trial. Judgment reversed.

Appellant was under treatment by Dr. Jerry Wetherell for occlusive arterial disease from October, 1972 through January, 1974. During this time, Matson underwent eight femoral arteriograms. In an arteriogram, the patient's artery is punctured with

a hollow needle and a wire with a soft tip is inserted into the blood vessel through the needle. The needle is then removed, and a catheter, generally a piece of polyethylene tubing, is threaded over the guide wire to the area of the suspected occlusion. Dye is injected through the catheter, enabling the radiologist to view the adjacent arterial system by X-ray and pinpoint an occlusion.

On December 2, 1973, appellant entered Maryvale Samaritan Hospital under Dr. Wetherell's direction. Dr. Wetherell, fearing an impending occlusion of the extracranial vessels of the aortic arch, ordered another arteriogram. Because the groin area had been the site of previous femoral arteriograms, Dr. Wetherell urged Dr. Naifeh, a specialist, to perform an axillary (armpit) arteriogram. Dr. Naifeh agreed, even though he was aware that appellant was taking Coumadin, a chemical which impedes the normal clotting mechanism of the blood.

When Dr. Naifeh tried to insert the guide wire into the brachial artery, it would only advance about six inches. He therefore inserted a catheter through which there was injected a small amount of dye into the artery, and by this means determined that the guide wire had lodged in the wall of the artery. Dr. Naifeh withdrew the catheter and guide wire, and put manual pressure on the area of the puncture to stop the bleeding. However, a large hematoma (collection of blood under the skin) formed at the site of the entry wound. Dr. Naifeh telephoned Dr. Wetherell and told him that the attempted arteriogram was unsuccessful and that a hematoma had formed. Dr. Wetherell examined appellant and decided the hematoma did not require surgery. Appellant was released from the hospital two days later.[1]

After appellant left the hospital, he continued to have pain in his right arm and his thumb on his right hand. It was necessary to elevate his arm to relieve the pressure on the swelling under the arm. Late in December, appellant entered the hospital for further vascular surgery. Dr. Wetherell entered the following notation in the hospital records on December 27, 1973:

" * * * Principal complaint is discomfort in right arm. During previous admission he had undergone attempt at right axillary artery catheterization for angiograph. However, this route was unsuccessful. He developed a large hematoma of the axilla and he complained of persistent discomfort mainly involving the shoulder and the back of the upper arm. He was taking a fair amount of narcotic for this. He was seen in the office periodically and advised that this would probably absorb and the pain would go away. When he came into the office yesterday he said that all of the pain was gone out of his shoulder and arm and had gone to his calf. He did insist that he had been provided a heating pad for the shoulder postoperatively. This morning he complains that he cannot abduct · the forearm with the elbow flexed. The hematoma in the axilla is considerably smaller than it had been, but there is still a fair amount of induration. Will get orthopedic opinion."

On January 4, 1974, Dr. Wetherell and Dr. William C. Brainard operated on appellant to remove the scar tissue surrounding the nerves in the axilla area resulting from the hematoma. Appellant filed this complaint against Dr. Wetherell, Dr. Naifeh, and Maryvale Samaritan Hospital, alleging negligence resulting in permanent nerve damage and a want of informed consent. All defendants except Dr. Naifeh were dismissed from the case prior to trial. The jury found in Dr. Naifeh's favor, and this appeal followed.

Appellant first argues that the trial court erred both when it refused to direct a verdict against Dr. Naifeh on the issue of liability and when it denied his motion for a judgment notwithstanding the verdict.

1. A femoral arteriogram was apparently performed on appellant on December 4, 1973. It revealed no occlusion in the carotid artery. No complications arose from this arteriogram, or from any of the other femoral arteriograms.

A verdict may be directed in favor of one party only where no evidence is introduced which would justify a reasonable person returning a verdict for the opposing party. *Smith v. Chapman,* 115 Ariz. 211, 564 P.2d 900 (1977); *Adroit Supply Co. v. Electric Mutual Liability Insurance Co.,* 112 Ariz. 385, 542 P.2d 810 (1975). We said in *Reader v. General Motors Corp.,* 107 Ariz. 149, 154, 483 P.2d 1388, 1393 (1971):

"It is well settled that a motion for a directed verdict admits the truth of all competent evidence introduced by the party opposing the motion, including all reasonable inferences to be drawn therefrom. Such evidence must be viewed most strongly against the movant and most favorably for the opposition. If, considering all the facts and circumstances, there is a reasonable likelihood that reasonable men may reach different conclusions, the question of fact in issue is to be decided by the jury. *Figueroa v. Majors,* 85 Ariz. 345, 338 P.2d 803 (1959); *Vigil v. Herman,* 102 Ariz. 31, 424 P.2d 159 (1967). * * * "

We think it is sufficient to say after examining the evidence in this case that a question was raised as to whether appellant's nerve damage was attributable to compression of the brachial plexus by the hematoma or to a "brachial stretch injury" occasioned by a later examination of appellant where he was "spread-eagled" on an operating table. Reasonable persons could have reached different opinions on this question. Hence, the motions were properly denied.

Appellant also argues that the trial court erred when it instructed the jury:

"You are instructed that you, as triers of the facts, are necessarily dependent on those versed in medical science and practice in matters not within the common knowledge of laymen. Under such circumstances you are not at liberty to set up lay standards and disregard the prevailing medical standards as presented through the expert witnesses by a preponderance of the evidence. Therefore, in determining whether or not, in this case, Dr. Naifeh is chargeable with the failure to possess or use reasonable skill and care in accordance with the standards I have given you, you are not to be governed by opinions of your own as laymen in disregard of the expert evidence in the case."

Appellant argues that this instruction was erroneous because the jurors could have found from their own common sense that Dr. Naifeh was negligent.

We have repeatedly held that a physician's negligence must be shown by expert medical testimony unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. *Pendleton v. Cilley,* 118 Ariz. 84, 574 P.2d 1303 (1978); *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977). The negligence alleged here was Dr. Naifeh's failure to use due care in the performance of the axillary arteriogram, the postoperative treatment of appellant, and the failure to inform either appellant or Dr. Wetherell of the possible complications which could result from the failure to give immediate postoperative treatment for the hematoma. From the simple recitation of the character of the negligence charged, Dr. Naifeh's acts were not so grossly negligent that laymen of their common knowledge could reasonably find the doctor guilty of malpractice.

The test for medical specialists was established in *Kronke v. Danielson,* 108 Ariz. 400, 403, 499 P.2d 156, 159 (1972):

" * * * for a plaintiff to recover in a medical malpractice case involving a specialist, he must prove that the defendant specialist in his acts failed to meet the standard of care required of physicians in the same speciality practiced by the defendant. To qualify an expert to express an opinion on what that standard of care is for the speciality of the defendant, the party offering the witness must establish the witness' knowledge and familiarity with the standard of care and treatment commonly practiced by physicians engaged in the same type of speciality as the defendant."

Four expert witnesses testified as to the standard of care for radiologists. Dr. Marshall D. Lustgarten, a radiologist who specializes in diagnostic radiology, was called as a witness for the defense. He testified that it would be below the standard of care for a radiologist not to inform a referring surgeon of the complication which occurred and also what could happen if the complication was not properly treated.

Dr. William Ingram, an associate of Dr. Naifeh, testified that as a practicing radiologist he discussed arteriogram cases both before and after the procedure with the referring surgeon.

Dr. Mohamed Kirdani, a radiologist specializing in arteriograms, testified that when a patient is on anticoagulants he has a personal conversation with the referring surgeon to make sure the surgeon is able to attend to the patient immediately if complications arise. When a hypothetical question based on the facts of the aborted arteriogram was asked, Dr. Kirdani stated that the prevailing standard of care would require the radiologist to consult with the referring surgeon whether the hematoma should be evacuated immediately.

Dr. John Johnson, a vascular surgeon, testified that in order to meet the applicable standard of care, "[t]he radiologist should notify the surgeon immediately and then * * * in joint consultation decide what needs to be done as far as the care of this patient." He also said that it is the radiologist's responsibility to inform the surgeon of the ramifications of complications which are a result of the procedure.

Dr. Naifeh acknowledged that he did not inform Dr. Wetherell of possible brachial plexus compression injury arising from the hematoma. Dr. Wetherell testified he was aware of the symptoms of neurologic compromise, but said that at the time of appellant's axillary arteriogram he was not "sensitive to being concerned about a hematoma as a result of an arteriogram causing paresis of the brachial plexus." He also stated that at the time he was not aware of any case in which a hematoma in the axilla area had caused brachial plexus compression.

Other testimony established that the threat of partial paralysis of the arm resulting from pressure of a hematoma was well documented in radiology journals by 1973. Dr. Naifeh acknowledged that it was within the learning of a radiologist that permanent impairment of the arm could practically be eliminated if proper postoperative care was afforded the patient.

The trial court instructed the jury:

"You are instructed that as a matter of law, the decision to do surgery in this case was a decision for Dr. Wetherell and the failure of Dr. Wetherell to do surgery, if in fact it was a failure, was the responsibility of Dr. Wetherell, for which Dr. Naifeh is not responsible, unless Dr. Wetherell was not aware of the potential danger of the hematoma to the plaintiff and Dr. Naifeh knew or should have known that Dr. Wetherell was not aware of the potential danger of the hematoma and then failed to communicate to Dr. Wetherell such information. In such a case, Dr. Naifeh would be liable for damages proximately flowing from such failure to communicate."

The instruction given by the court conforms to appellee's theory of the case: since Dr. Wetherell was a board certified surgeon with sixteen years of experience, Dr. Naifeh could properly assume that Dr. Wetherell would know of potential paralysis of the patient's arm which might result from the hematoma and that Dr. Naifeh complied with the applicable standard of care when he telephoned Dr. Wetherell and informed him that the axillary arteriogram was not a success and a hematoma had formed.

In *Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411 (1977), we held that it is error to instruct the jury on a theory of the case which does not find support in the evidence. In the instant case, the expert testimony established that the decision whether surgery on the hematoma was necessary was Dr. Wetherell's. It also established that the radiologist had an affirmative duty to consult with the referring sur-

geon and inform him of the potential dangers of any complication which might result from the procedure undertaken by the radiologist.[2] The theory of appellee that Dr. Naifeh could escape liability unless he knew or should have known Dr. Wetherell was not aware of the potential danger of the hematoma is not sustained by the record, and the submission to the jury of appellee's instruction was error.

Appellee argues that the instruction is in accord with *Brooker v. Hunter,* 22 Ariz. App. 510, 528 P.2d 1269 (1974), *approved* 111 Ariz. 578, 535 P.2d 1051 (1975), and that the decision to do postoperative surgery to relieve the hematoma was solely Dr. Wetherell's responsibility once he had been informed of the hematoma. In this last cited case, the widow of a deceased patient brought a medical malpractice action against an orthopedic surgeon, Dr. Hunter, a neurosurgeon, Dr. Hoffman, an internist, and a hospital after her husband died from an apparent coronary thrombosis following back surgery. Dr. Hunter and Dr. Hoffman filed motions for summary judgment, which were granted. The Court of Appeals affirmed, saying:

> " * * * there is no evidence that at the time Drs. Hunter and Hoffman last saw their patient that he was outwardly, or from information then available, in an unstable and dangerous condition. We therefore hold that these doctors, being under no duty to make inquiries concerning the patient's cardiac condition which were not observable or part of his record, cannot be liable for failing to make such an inquiry." 22 Ariz.App. at 516, 528 P.2d at 1275.

*Brooker* is not pertinent to the problem here. There the court concluded that the conduct of neither Dr. Hunter nor Dr. Hoff-

man fell below the standard of care required of a careful, prudent doctor because both the neurosurgeon and orthopedic surgeon were unaware of the patient's endangered condition and the internist had assumed the responsibility for monitoring the patient's heart condition. In the case at bar, the evidence shows that Dr. Naifeh knew of the potential complication, but failed to pass this knowledge on to the surgeon who would have to make the decision whether to evacuate the hematoma. The jury could have concluded that appellee's inaction was below the prevailing standard of care.

■ We have examined appellant's claim that the jury was not properly instructed concerning Dr. Naifeh's duty to inform appellant of the possible complications arising out of the hematoma. The requested instruction is to the effect Dr. Naifeh had an affirmative duty to tell his patient of the need for treatment. There is no evidence from which the jury could conclude this did not conform to the standard of care for radiologists. The expert medical testimony is that in many cases it is unwise to alarm the patient, especially when the complication is recognized and the patient is under supervised medical attention. Lacking affirmative evidence that appellant demanded that he be fully advised, we find no error on this point.

Reversed and remanded for a new trial.

CAMERON, C. J., and HOLOHAN, J., concurring.

---

**2.** Plaintiff's Requested Instruction No. 33 provided:

"The evidence in this case indicates that Dr. Naifeh knew that Mr. Matson had incurred a hematoma as a result of the arteriogram. You are instructed that, as a matter of law, Dr. Naifeh was required to adequately communicate to Dr. Wetherell all proper and necessary information concerning the care and treatment of Mr. Matson's hematoma

condition as required by the applicable standard of care. The failure to make such communication would constitute negligence and he would be liable for all damages proximately caused by such negligence."

Instructions which go to the gist of an action, and are supported by the evidence, must be given. See *Harvey v. Kellin,* supra, 115 Ariz. at 502, 566 P.2d 297.