606 P.2d 3

Max TAYLOR, M.D., Appellant,

v.

Frances Margaret DIRICO, surviving spouse of Mario DiRico, deceased, for herself and as personal representative of Marisa Christina DiRico and Philip Anthony DiRico, surviving minor children of Mario DiRico, deceased, Appellee.

No. 14171.

Supreme Court of Arizona, In Division.

Jan. 23, 1980.

**514**

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by P. Michael Whipple and John H. Westover, Burch, Cracchiolo, Levie, Guyer & Weyl by Duane A. Olson, Phoenix, for appellant.

Norman S. Herring, Phoenix, for appellee.

HOLOHAN, Vice Chief Justice.

Appellant Max Taylor, M.D., appealed from a judgment entered against him and Roy S. Weinrach, M.D., on a jury verdict in a wrongful death action. We took jurisdiction pursuant to Rule 19(e), Rules of Civil Appellate Procedure, 17A A.R.S.

A wrongful death action was brought by plaintiff-appellee Frances Margaret DiRico, for herself as surviving spouse of the decedent, Mario DiRico, and for their two surviving minor children. The plaintiff alleged that the appellant and two other physicians, Doctors Weinrach and John E. Cahill were negligent in their diagnosis and treatment of Mario DiRico, and this negligence resulted in his untimely death.

Mario DiRico visited Dr. Cahill, a general practitioner, on April 15, 1974, for treatment of a lump in his right armpit. After examining the area of complaint, Dr. Cahill referred Mr. DiRico to a surgeon, the appellant.

An examination of the area of complaint was conducted by the appellant, and a biopsy was performed to remove tissue for examination by a pathologist. The appellant placed a drain in the incision and enclosed it in stitches.

The tissue examination resulted in a diagnosis by the pathologist that Mr. DiRico had a malignant lymphoma. The appellant removed the drain from the biopsy site on April 22, and he referred Mr. DiRico to Dr. Weinrach, a specialist dealing with tumors. Further tests were conducted at the request of Dr. Weinrach. As a result of these tests there was concern that the disease might have progressed along the lymph chain to the area below the diaphragm. Mr. DiRico was sent back to the appellant for an exploratory operation in the abdominal area.

On May 20, 1974, the appellant examined Mr. DiRico and found among other things that the site of the biopsy in the armpit was swollen and inflamed. There was also swelling and inflammation in the cervical area. The appellant had Mr. DiRico admitted to the hospital on May 22. Before surgery Mr. DiRico showed a temperature

of 102 degrees and certain other conditions consistent with infection. The surgery was performed, and the tissue removed from the abdominal area was examined and found to be negative for cancer.

Mr. DiRico continued to have an elevated temperature after the operation, and the area of the armpit continued to be swollen and inflamed. On June 5 the appellant ordered treatment with antibiotics. The appellant authorized the discharge of Mr. DiRico from the hospital on June 9.

After his discharge from the hospital Mr. DiRico's condition became progressively worse. On June 19 he was readmitted to the hospital. Both the appellant and Dr. Weinrach attended him, but Mr. DiRico died on June 21, 1974. He was 38 years of age at the time of his death.

The parties to the action disagreed as to the cause of death. The appellee's evidence was that cancer was not the direct cause of death. The cause of death was the improperly treated infection. Appellant's evidence was that the cause of death was cancer.

At the close of all evidence at trial, the trial court granted a directed verdict in favor of Dr. Cahill. The case was submitted to the jury as to the remaining defendants, and the jury returned a verdict in favor of the plaintiff and against both the appellant and Dr. Weinrach for $200,-000.

The appellant filed a timely appeal.

I

The appellant contends that the trial court erred in failing to inform the jury of the settlement agreement between Dr. Weinrach and the appellee.

After all parties rested, in proceedings in chambers, counsel for plaintiff and counsel for Dr. Weinrach disclosed to the court and appellant's counsel that they had reached an agreement. The terms of the agreement were that Dr. Weinrach would pay $25,000 to appellee, and she would be entitled to retain that sum in the event of a defense verdict or a verdict against Dr. Weinrach alone. In the event of a verdict

against appellant either solely or along with Dr. Weinrach, the appellee was to enforce the judgment against appellant only, and she was to repay the $25,000 to Dr. Weinrach.

Counsel for appellant demanded that the jury be informed of the agreement or that Dr. Weinrach be excluded from further participation in the trial. The trial court denied the requests. Appellant argues that the ruling was error. He maintains that the agreement is the type which should be made known to the jury under the rule set forth in *Sequoia Manufacturing Co., Inc. v. Halec Construction Co., Inc.*, 117 Ariz. 11, 570 P.2d 782 (App.1977). Appellant particularly refers to the language of the Court of Appeals from the cited case:

"We believe there are clearly circumstances in which *Gallagher* agreements should be admitted into evidence or made known to the jury by way of instruction, for limited purposes. The classic situation wherein this would not only be permissible but probably obligatory if requested by the non-agreeing party, is where the agreeing defendant can improve his financial position by insuring a verdict of a certain amount, or over a certain amount against the non-agreeing defendant. The *Gallagher* case itself presented this situation." 117 Ariz. at 23, 570 P.2d at 794.

The appellee points out that the agreement was made known to the trial court and the nonagreeing counsel as soon as possible after the agreement had been reached. *See Mustang Equipment, Inc. v. Welch*, 115 Ariz. 206, 564 P.2d 895 (1977). Appellee contends that there was no fraud or collusion involved, and the agreeing parties continued in a bona fide adversary posture for the remainder of the trial.

Counsel for Dr. Weinrach stated to the trial court:

"I have no understanding whatever with Mr. Herring [plaintiff's counsel] that I will attempt to lay off any of the responsibility on Dr. Taylor. It was not my intention ever to do so and I will do my

best to keep my argument just as it would have been if this arrangement had not been made." (Reporter's Transcript, Vol. XIII, p. 1910.)

Review of the record confirms that the closing argument made by Dr. Weinrach's counsel was, in fact, consistent with his statements, quoted above. We are satisfied that the agreement had no effect upon the integrity of the trial.

In *Sequoia Manufacturing Co., Inc., supra*, the Court of Appeals in upholding the trial court's decision not to permit disclosure to the jury, reasoned that the agreeing defendant's basic motivation was to limit its maximum liability to the plaintiff and the court therefore declared:

"[W]e believe a trial court is in a unique position to view the factors surrounding such an agreement and to decide, when requested, whether such an agreement should be admitted. . . . After observing the conduct of all counsel, their demeanor, their witnesses, and the overall atmosphere of the courtroom, the trial judge determined it unnecessary in this case to disclose the agreement to the jury. In an instance such as this, we invest the trial court with considerable discretion. We find no abuse of discretion." 117 Ariz. at 24, 570 P.2d at 795.

In the present case, disclosure of the agreement which was entered into after the close of all evidence would not have been useful for impeachment, or as an aid to the jury to judge any matter of motive or credibility. We therefore hold that on the facts of this case, the trial court was correct in not permitting disclosure of the agreement to the jury.

## II

The appellant argues that the trial court committed reversible error in refusing to give the Defendant's Requested Instruction No. 11, which states:

"A physician may not be held liable in the exercise of his medical judgment if he selects a method of therapy which is approved by respectable members of the medical profession. The fact that other members of the medical profession may not recognize such method of treatment as being an approved method is not sufficient to hold the Defendant liable so long as there are respectable practitioners in the profession who do recognize and employ such method of treatment."

In essence, the appellant contends that without such an instruction, the jury could find malpractice by the defendant physician on the basis of another physician's opinion which disagrees with the course of treatment undertaken, even though the defendant was well within the bounds of the actual standard of care imposed upon him.

The instructions given by the trial court told the jury that negligence consisted of doing something forbidden by the recognized standard of care or neglecting to do something which the standard required. The trial court also instructed the jury that merely following a different course of treatment than is followed by some physicians was not sufficient to establish malpractice. The jury was cautioned that the test was whether the defendant departed from the approved standard of treatment by physicians of the defendant's specialty in Arizona.

The issue before the jury was whether the appellant provided medical care and treatment consistent with good practice as required by the applicable standard of practice. That issue was adequately covered by the instructions given. It was not necessary for the trial court to instruct on every refinement suggested by counsel. *Harvey v. Kellin*, 115 Ariz. 496, 566 P.2d 297 (1977).

## III

The appellant also argues that the trial court erred in giving Plaintiff's Requested Jury Instruction No. 14, which reads:

"If you find from a preponderance of the evidence under the instructions of the Court that the defendant doctors were negligent and that negligence was a proximate cause of the death of Mario DiRico, then the defendant doctors would be liable, even though the disease or the

physical condition of Mario DiRico may have resulted in death in the near future." (R.T. Vol. XIV, p. 2115.)

The appellant asserts that the instruction was inappropriate for several reasons: (1) contributory negligence was an issue raised in the case and was a factor which the instruction did not take into account; (2) the use of the term "near future" was so ambiguous as to confuse the jury concerning the character of proximate cause because it implied liability and consequent damages were not related to the existing physical condition of the decedent; (3) the instruction was a one-sentence formulation of the plaintiff's theory of recovery, the use of which was condemned by this court in *Coyner Crop Dusters v. Marsh*, 91 Ariz. 371, 372 P.2d 708 (1962).

In *Coyner Crop Dusters, supra*, we warned that the use of an instruction which directs the jury to find a certain way dependent upon their belief in certain facts set forth in the instruction was "fraught with danger." We went on to state:

> "If an essential fact is omitted, the instruction *standing alone* is erroneous, *Taylor v. Fitzpatrick*, 235 Ind. 238, 132 N.E.2d 919 (1956). Whether such error is prejudicial depends on a review of the instructions as a whole. We have often stated that instructions must be considered as a whole, *Musgrave v. Githens*, 80 Ariz. 188, 294 P.2d 674 (1956), and that if an instruction is incomplete, it is not reversible error if the proper qualifications are given in some other portion of the instructions, *Humphrey v. Atchison, T. &. S. F. Ry. Co.*, 50 Ariz. 167, 70 P.2d 319 (1937). The test is whether the jury would be misled as to the proper rule of law, *Jost v. Ross*, 82 Ariz. 245, 311 P.2d 840 (1957)." (Emphasis added.) 91 Ariz. at 376, 372 P.2d at 711.

We do not address the issue raised by the appellee that the appellant did not properly preserve the issue as error for appeal. A review of the instructions as a whole reveals that the jury was correctly advised on the applicable law in respect to contributory negligence, and the questioned instruction did not mislead them.

In its use of the term "near future," the contested instruction apparently attempted to instruct the jury that even if the decedent was destined to die from cancer eventually, that fact would not excuse the defendants from liability for negligence causing an earlier death. This characterization of the instruction is borne out by the fact that the question of liability was separated throughout the remainder of the instructions from the question of the amount of damages. In addition, the jury was specifically instructed on the meaning of proximate cause. It does not appear that the use of the term "near future" was so misleading as to confuse the trier of fact about proximate causation.

We therefore find, upon review of the instructions as a whole, that giving the questioned instruction was not error.

### IV

The appellant asserts that the trial court erred in denying a new trial upon the ground of counsel misconduct. The appellant urges that the cumulative effect of misconduct in the form of gratuitous comments, attempted cross-examination of the appellant upon the answer filed by his attorney, and making a "golden rule" argument to the jury, was so prejudicial as to require a new trial.

Plaintiff's counsel attempted to cross-examine the appellant upon the defense of contributory negligence contained in the answer to the complaint. The appellant's attorney objected on the basis that cross-examination on the pleadings not signed by the party is improper. The court sustained the objection. In closing argument, the plaintiff's counsel stated:

> "And I can't imagine that you can find that Mrs. DiRico is negligent because the one final thing on that is how can defendants come into court and look you in the eye and say, 'We didn't do what we should.' But remember something. The defense of contributory negligence says, 'Okay. I was negligent. Okay. I will

admit for the purposes of this defense, I was negligent. I was wrong. But the other side did something wrong, too.'

"How in the world can these doctors and their lawyers face you when they admit by that defense that they were negligent; that they didn't do what they should have done; . . ." (R.T., Vol. XIII, p. 2097.)

Dr. Weinrach's counsel objected, and asserted, "That's misstating of the law. The assertion of contributory negligence is not an admission of negligence on the part of the defendant." (R.T., Vol. XIII, p. 2098.) The court sustained the objection.

The "golden rule" argument of which the appellant complains, was contained in the following comments of plaintiff's counsel during closing argument:

"If this man had been treated as you would like to be treated yourself—you think about it. If you had a loved one or you yourself or any situation, from what you have heard on this witness stand—" (R.T., Vol. XIII, p. 1918.)

"And do you think that if your son or your daughter or mother or father or you yourself, now that you know—" (R.T., Vol. XIII, p. 1919.)

In response to those statements made to the jury, the appellant's counsel objected on the basis of appealing to the jury directly and the court sustained the objections.

■ While this type of argument may be improper, the extent of the "golden rule" argument made in this case was not sufficient to have caused the jury to return a verdict which was the result of passion and prejudice, and we therefore will not interfere. *Hales v. Pittman*, 118 Ariz. 305, 576 P.2d 493 (1978); *Zugsmith v. Mullins*, 86 Ariz. 236, 344 P.2d 739 (1959).

■ The trial court has great discretion in controlling the conduct of trial. An appellate court will normally defer to the trial court's ruling on misconduct of counsel unless it is clear that the trial court has abused its discretion. *Taylor v. Cate*, 117 Ariz. 367, 573 P.2d 58 (1977). Absent an abuse of discretion resulting in a clear

showing of prejudicial error, the ruling of the trial court denying a new trial on the basis of counsel misconduct will not be disturbed on appeal. *Hales v. Pittman, supra.*

Since we are not convinced that the verdict rendered by the jury was the result of passion and prejudice, or that the cumulative effect of the alleged misconduct deprived the appellant of a fair trial, we find that there was no abuse of discretion by the trial court in denying appellant's motion for a new trial.

The appellant's final point is that the jury verdict was against the weight of the evidence because there was no competent evidence to establish a deviation from the standard of care or to establish a causal connection between the appellant's actions and the death of Mr. DiRico. Appellant maintains that there was no competent evidence submitted by the plaintiff to show a deviation from the standard of care. The only witness offered by plaintiff was an internist, and appellant argues that this witness was not competent to testify about the standard of care required by surgeons.

■ In a medical malpractice action, it is not necessary that a witness be of the same specialty as the defendant in order to be competent to testify upon the governing standard of care; the witness' knowledge of the applicable standard of care may be the result of education, experience, observation or association with that specialty. *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (App. 1978); *Board of Regents of the University and State Colleges of Arizona v. Cannon*, 86 Ariz. 176, 342 P.2d 207 (1959).

■ The expert presented by the plaintiff was Dr. John Palmer, a practicing physician, an internist, and member of the faculty of the University of Arizona Medical College. Dr. Palmer did not testify concerning the performance of surgical technique. His testimony concerned the standard of care in the overall treatment of the patient before and after surgery. He also testified about the proper procedures in diagnosis and treatment of lymphoma. The position advanced by plaintiff as a basis for

the negligence action involved the suitability of the patient for surgery in view of his condition. In short the issue was not how the operation was performed but whether it should have been performed before the infection affecting Mr. DiRico had been brought under control.

Dr. Palmer had experience in determining the suitability of patients for surgery. He had supervised staging* of patients with lymphoma and testified that as a part of that procedure he had decided when and whether certain surgery should be performed. In addition he had treated patients with lymphoma in his practice. He had observed various specialists called in to treat and diagnose patients with lymphoma, and he had read and reviewed medical literature concerned with various kinds of lymphoma.

In light of the matters presented the trial court was correct in permitting Dr. Palmer to testify as an expert.

The testimony of Dr. Palmer was that the attending physicians deviated from the standard of care required in the treatment of Mr. DiRico. Dr. Palmer further stated that in his opinion the departure from the standard of care was the cause of Mr. DiRico's death.

On appeal, the evidence must be viewed in a light most favorable to the prevailing party at trial. *Harvey v. Kellin, supra.* Considering the evidence presented through plaintiff's expert, there was sufficient competent evidence to support the jury's verdict and the judgment of the trial court.

Affirmed.

STRUCKMEYER, C. J., concurs.

GORDON, Justice (specially concurring):

I concur with the majority that, in the posture of this case, the trial court did not improperly refuse to permit disclosure of the *Gallagher*[1] agreement to the jury. I am however, deeply concerned about *Gallagher* agreements, and I believe they present several thorny problems for our adversary system of justice.

The term "*Gallagher* agreement" is a generic term referring to a variety of contractual devices used in a multiple defendant lawsuit. Plaintiff promises one or more agreeing defendants that, in the event of a judgment against both agreeing and non-agreeing defendants, plaintiff will execute only, or at least in the first instance, against non-agreeing defendants. In return, the agreeing defendants are to remain as parties to the suit, and they promise to give valuable consideration to the plaintiff. This consideration may be a guaranteed recovery for plaintiff, as in *City of Tucson v. Gallagher,* 108 Ariz. 140, 493 P.2d 1197 (1972),[2] and the present case. It may be a promise to loan money without interest, as in *Sequoia Manufacturing Company, Inc. v. Halec Construction Co., Inc.,* 117 Ariz. 11, 570 P.2d 782 (App.1977). It may be something other than money. *See Mustang Equipment, Inc. v. Welch,* 115 Ariz. 206, 564 P.2d 895 (1977). The variations on the *Gallagher* agreement are "limited only by the ingenuity of counsel and the willingness of the parties to sign * * *." *Maule Industries, Inc. v. Roundtree,* 264 So.2d 445, 447 (Fla.App.1972), *rev'd.* 284 So.2d 389 (Fla. 1973).

In the instant case, as is typically the situation with *Gallagher* agreements, the agreeing defendant stood to improve his position financially if there were a judgment against the nonagreeing defendant. If that judgment were large enough, even if it were also against the agreeing defendant as well as the nonagreeing defendant, the former would end up paying nothing

---

* "Staging" refers to the investigative efforts of physicians to determine the extent of the disease, once the diagnosis is known. (R.T., Vol. II, pp. 169–170.)

1. Named for *City of Tucson v. Gallagher,* 108 Ariz. 140, 493 P.2d 1197 (1972).

2. The terms of the agreement are set out more completely in the Court of Appeals opinion in *City of Tucson v. Gallagher,* 14 Ariz.App. 385, 483 P.2d 798 (1971).

and the latter would pay for the negligence of both defendants. Ironically, the agreeing defendant would incur its maximum liability under the agreement if the plaintiff lost completely in the lawsuit! Such a situation naturally raises the specter of collusion.

In the present case we have been required to examine the closing argument of counsel for the agreeing defendant to see if he, in fact, did not allow the agreement to alter what he would normally say. In the past, this Court has considered whether an agreement caused a party to adopt a trial strategy it would not have otherwise used. *See Mustang Equipment, Inc. v. Welch, supra; City of Tucson v. Gallagher, supra.* Following *Sequoia Manufacturing Co., Inc. v. Halec, supra,* we have today placed a burden on the trial court to carefully observe the behavior of the parties at trial to make sure the agreement does not distort the proceedings. Implicit in the present opinion is the responsibility of the trial court to determine exactly when the agreement was made. *See Sequoia Manufacturing, supra.*

*Gallagher* agreements thus create situations rife with temptation to act dishonestly and collusively. The courts must carefully monitor the proceedings to insure that the parties honestly and vigorously contest the issues as they would have, but for the agreement. Such an artificial posture cannot improve the public's confidence in our adversary system of justice. *Cf. Mustang Equipment, Inc., supra.*

In addition to raising problems of collusion and unfairness at trial, *Gallagher* agreements are financially inequitable. They permit one defendant, at a relatively modest cost, to pass all liability onto the shoulders of another defendant, regardless of the relative degrees of fault among the parties. Of course, the agreement only makes certain an outcome which would be possible in any event, since plaintiff could execute against any party he wishes, and the defendant who paid the judgment could

not seek contribution from co-defendants. *Cf. Mustang Equipment, supra; City of Glendale v. Bradshaw,* 16 Ariz.App. 348, 493 P.2d 515, *supplemented on rehearing,* 16 Ariz.App. 483, 494 P.2d 383, *aff'd. in part, rev'd. in part,* 108 Ariz. 582, 503 P.2d 803 (1972).

*Gallagher* agreements have been held invalid in several jurisdictions. *E. g., Cox v. Kelsey-Hayes Co.,* 594 P.2d 354 (Okl.1978); *Lum v. Stinnett,* 87 Nev. 402, 488 P.2d 347 (Nev.1971). The Ethics Committee of the State Bar of Arizona, in its Opinion No. 70–18, issued July 28, 1970, condemned secret *Gallagher* agreements. Although that opinion stated that both their secrecy and the weakening of the adversary nature of the trial engendered by these agreements were unethical, our courts have upheld these agreements as long as there has been prompt disclosure to the court and other parties. *See Mustang Equipment, supra; City of Glendale v. Bradshaw, supra.*

Although *Gallagher* agreements create problems, I would not, under the present state of tort law, hold them *per se* invalid. A defendant in a multiple defendant lawsuit is under great pressure to limit his potential liability, since he may ultimately be required to pay, without contribution, for the damages caused by all defendants. The plaintiff, on the other hand, is understandably reluctant to completely release any alleged tort-feasors from the lawsuit. *See, City of Tucson v. Gallagher, supra.*

I believe that a rule permitting contribution among joint tortfeasors would ameliorate the problem of partial settlements in a multiple defendant lawsuit. The pressure upon defendants to enter into *Gallagher* agreements would be diminished and the validity of these agreements, as a defense to a claim for contribution by non-agreeing defendants against agreeing defendants, would be framed in a new perspective.

The rule prohibiting contribution among joint tortfeasors is ripe for change by our Legislature[3] or ought to be reconsidered by

---

3. A version of the Uniform Contribution Among Tortfeasors Act was introduced last

year in the Legislature on February 1, 1979. It did not become law.

this Court when the issue is properly before it. From the original English rule prohibiting contribution among intentional tort-feasors who acted in concert, most courts in this country, having lost sight of the rule's origins, extended the proscription against contribution to include tort-feasors who were merely negligent and who had acted concurrently rather than in concert. *See* Prosser, Law of Torts, § 50 (4th Ed. 1971).

The judicially created rule in Arizona does not rest on a firm foundation. Its origin appears to be *Schade Transfer and Storage Co., Inc. v. Alabama Freight Lines*, 75 Ariz. 201, 254 P.2d 800 (1953). *Schade* involved a claim for indemnity by a defendant against an impleaded third party defendant. After finding that the relationship between the defendant and third party defendant did not create a right to indemnity, this Court stated that the only basis for a recovery on the third party claim would be if the latter had been independently negligent and had been the sole proximate cause of injury. Finding that both parties had acted together to cause the injury, the Court said: "If this constitutes a tort the parties were joint tortfeasors, and we are not aware of any law that permits the recovery of one against the other under such circumstances." 75 Ariz. at 204, 254 P.2d at 802. The Court cited neither authority nor policy consideration for its decision.

*Schade* was followed by *Blakely Oil, Inc. v. Crowder*, 80 Ariz. 72, 292 P.2d 842 (1956), which also involved a third party claim for indemnity. The Court held that the defendant had no cause of action for indemnity when its liability to plaintiff was based on its own negligence. Assuming the third party defendant was also negligent, he would be a joint tortfeasor against whom an action for contribution could not be maintained. *Blakely Oil, Inc., supra*. For this last proposition, the Court relied primarily on a Pennsylvania indemnity case. It also cited *Schade, supra*.

At the present time, at least thirty-five states permit contribution by statute and four permit it by judicial decision. Com-

ment, Denying Contribution Between Tort-feasors in Arizona: a Call for Change, 1977 Ariz.St.L.J. 673. It is, perhaps, time for this state to join the majority.