576 P.2d 493

**Leland HALES and Phyllis Hales, husband and wife, Appellants,**

v.

**Hal W. PITTMAN, M. D. and Neurology-Neurosurgery Associates, Ltd., a professional corporation, Appellees.**

No. 13177.

Supreme Court of Arizona, In Banc.

Feb. 23, 1978.

Rehearing Denied March 28, 1978.

Norman Herring, Robert J. Stephan, Jr., Phoenix, for appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by John H. Westover, Phoenix, for appellees.

GORDON, Justice:

On June 9, 1971, Dr. Hal Pittman performed a surgical procedure on Leland Hales in order to relieve Hales of the pain caused by tic douloureux, a disease also known as trigeminal neuralgia. Unfortunately, the procedure destroyed the nerve

fibers of the ophthalmic division causing the anesthetization of the cornea of the right eye, coupled with a loss of the blink reflex and tearing mechanism. Hales instituted a suit alleging, *inter alia,* breach of trust, battery and malpractice.[1] The trial resulted in a defense verdict, and Hales appealed. We have taken jurisdiction pursuant to Rule 47(e), 17A A.R.S., Rules of the Supreme Court.

Tic douloureux is an excruciating facial pain which occurs in spasms. Apparently the cause is unknown, and the pain may be triggered by facial movement when talking or eating. After attempts to treat Hales with medications and an infraorbital alcohol block proved unsatisfactory, surgical intervention was suggested. The surgery eliminates the pain through destruction of portions of the fifth cranial nerve which serves the right side of one's face. Ideally, only two of the three divisions of the fifth cranial nerve are destroyed or severed, leaving the first or ophthalmic division functional. At the time of Hales' treatment, at least three methods of treatment were recognized: subtemporal rhizotomy, injections of hyperbaric alcohol or phenol, and radio frequency coagulation. The subtemporal rhizotomy involves a direct surgical entrance at the base of the skull exposing the fifth cranial nerve. The second and third division nerves are then selectively severed. An injection of hyperbaric alcohol or phenol into the fifth cranial nerve root, the Gasserian ganglion, causes destruction of the nerve fibers by caustic action of the injected solution. Finally, radio frequency coagulation involves a needlelike cathode which is injected into the Gasserian ganglion through an opening in the base of the skull. The nerve fibers are then selectively destroyed by the use of controlled heat developed from radio frequency current.

The probability of an anesthetic cornea occurring varied among the three procedures. Both the subtemporal rhizotomy and radio frequency coagulation presented a five to seven percent chance of an unwanted destruction of the ophthalmic division. Injection of phenol, on the other hand, carried a 23 percent probability of an anesthetic cornea. Of the three methods, the injection of phenol was chosen. Dr. Pittman inserted a 3½ inch needle upward between the right eye and mouth of Hales, injecting .2 cc of phenol. The second and third divisions were immediately anesthetized, and the first division became anesthetic in a few minutes. An additional .1 cc of phenol was then injected to permanently destroy the nerve tissue. Although Dr. Pittman hoped the first division would regenerate and return sensation to the right eye, this never occurred.

In this appeal, Hales has raised six questions, half of which are related to the issue of informed consent.

### Breach of Trust

As both parties recognize, the relationship between a physician and his patient is one of trust and confidence which obligates the physician to exercise the utmost good faith. *Batty v. Arizona State Dental Board,* 57 Ariz. 239, 112 P.2d 870 (1941); *Acton v. Morrison,* 62 Ariz. 139, 155 P.2d 782 (1945). Appellant argues that this concept renders Dr. Pittman liable for the unfavorable results of the surgery because Hales had told Pittman, "Doctor, I can't have anything done to me that's going to interfere with my ability to make a living and support my wife and children". The flaw in appellant's theory, as applied to the facts of this case, is that the patient, not the physician, makes the decision on whether to undergo the operation. In other words, if the physician properly informs the patient of the nature and probable results of the operation, as well as alternative methods of treatment, and the patient consents to the operation, then, absent malpractice, the physician is not liable for any

1. For clarity in the following discussion, the term "malpractice" will only refer to a negligence theory, as opposed to the theory of bat- tery which is also considered. See pp. 498, 499, *infra.*

unfavorable results.[2] *Shetter v. Rochelle,* 2 Ariz.App. 358, 409 P.2d 74 (1965). However, because of the fiduciary relationship between physician and patient, the scope of the disclosure required can be expanded by the patient's instructions to the physician. Although the probability of an adverse result may seem slight to the physician, so long as that physician wishes to limit his liability for such results by placing the decision to operate in the hands of the patient, he cannot withhold information if it is relevant to that patient's ability to make an informed consent. Otherwise, by withholding necessary information the physician would usurp the patient's ability to form his own opinion and would, in essence, be making the decision of accepting the non-disclosed risk for the patient. *See Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772 (1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Miller v. Kennedy,* 11 Wash.App. 272, 522 P.2d 852 (1974), *aff'd,* 85 Wash.2d 151, 530 P.2d 334 (1975). This would violate the fundamental right of every adult of sound mind to determine what should be done to his body. *Shetter v. Rochelle, supra; Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92 (1914). Since Hales' wife was an invalid and his children suffered from defective hearing, he deemed his ability to work to be of the utmost importance. He instructed Dr. Pittman of these facts and should have been informed of the risks which could affect his ability to work. Yet, if he gave an informed consent to the operation, he cannot now maintain an action based on the occurrence of the risks to which he consented. The choice simply belonged to the patient and he cannot complain for having made an informed, albeit unfortunate, decision. If, on the other hand, Dr. Pittman failed to provide Hales with sufficient information to allow an informed decision to be made, the law recognizes an action founded on battery.[3] Additionally, if an undisclosed risk occurs, a patient may pursue a malpractice action premised on a negligence theory. *See, e. g., Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972); *Canterbury v. Spence, supra.* We do not believe that the law in Arizona should be extended to recognize a new cause of action based on breach of trust when an adequate remedy for this case already exists. To do otherwise would ignore the underlying premise that the patient controls his own destiny.

### Battery Instructions

Appellant next contends his battery theory was not adequately presented to the jury. The basis of this argument arises from the injection of the additional .1 cc of the phenol solution. Appellant contends that even if he consented to the initial .2 cc injection which possibly could have destroyed the first division of the fifth cranial nerve, he did not consent to the additional .1 cc which Dr. Pittman injected to prevent nerve regeneration. Thus, he requested instructions which provided, in relevant part:

" * * * if you find from the evidence that the plaintiff consented that the defendant perform a certain operation which would not affect his ability to earn a living, and if you find from the evidence that the defendant performed another and different operation or a greater operation without the plaintiff's permission and consent which defendant knew or reasonably should have known would affect Lee Hales' ability to earn a living, then the defendant has committed a battery and is liable to the plaintiff for all damages resulting therefrom".

Rather than utilizing appellant's proposed instructions, the trial court succinctly instructed the jury:

"A surgeon may perform a surgical procedure only with the patient's consent. If the surgical procedure is performed without the patient's consent, the sur-

---

2. Of course, if a physician guarantees or warrants a certain result, he could still be liable for breach of contract.

3. A.R.S. § 12–562(B) abrogated battery as a cause of action subsequent to the institution of this suit.

geon commits a battery on the patient. For the patient's consent to be valid it is necessary that he be made aware substantially of the nature of the surgical procedure proposed and the probable results of the operation."

If the injection of the additional .1 cc of phenol altered the probable results of the operation of which appellant had been appraised, then, pursuant to the court's instructions, the consent would not have been valid. Thus, we feel the court's instruction adequately covered the foregoing theory, as well as appellant's theory that "the defendant performed another and different operation or a greater operation without the plaintiff's permission and consent". This alternate theory was covered by instructing the jury, "If the surgical procedure is performed without the patient's consent, the surgeon commits a battery on the patient". Pursuant to this instruction, anything greater or different than the procedure consented to becomes a battery. *See Cathemer v. Hunter,* 27 Ariz.App. 780, 558 P.2d 975 (1976). Once the court has defined the legal principles in understandable language, it becomes the obligation of counsel to explain the applicability of the legal principles to the facts in evidence. The court is not required to instruct on every suggested refinement. *Porterie v. Peters,* 111 Ariz. 452, 532 P.2d 514 (1975). Since the trial court properly instructed the jury on the issue of battery, it was not error to refuse appellant's instructions on the same subject matter. *Brierly v. Anaconda Company,* 111 Ariz. 8, 522 P.2d 1085 (1974); *Gibbons v. Williams,* 93 Ariz. 116, 378 P.2d 926 (1963).

Appellant also requested and was denied instructions based on a warranty theory. Our review of the record has not revealed any mention of breach of warranty as a cause of action in the complaint, interrogatories, or pretrial stipulation. Nor does the record indicate that the pretrial stipulation was modified during the course of the trial. Accordingly, the trial court was justified in refusing to instruct the jury on a breach of warranty theory. *See Loya v. Fong,* 1 Ariz.App. 482, 404 P.2d 826 (1965); 17A A.R.S. Super.Ct.Uniform Rules of Practice, Rule 6.

## Ordinary Care

Appellant also proposed negligence instructions which were framed in terms of ordinary care, as required of a layman, rather than the standard of care required of physicians and specialists. Because of a physician's special skills and knowledge on which the public relies, he must act in accordance with the standards of his profession. Prosser, Law of Torts, § 32 (4th ed. 1971). Of course, in cases where the negligence complained of is so gross that a layman would have no difficulty in recognizing it, the plaintiff is not required to establish the requisite standard of care through expert testimony. *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977); *Revels v. Pohle,* 101 Ariz. 208, 418 P.2d 364 (1966). This case, however, does not fit this exception. Even in such cases, the physician incurs liability because of his breach of the standard of care applicable to physicians on account of their special knowledge. Because the issue of reasonable care is inexorably intertwined with an actor's skills and knowledge, the instructions of the trial court which were framed in terms of the skill and learning of a neurosurgeon properly covered this area of the law. Therefore it was not error to refuse appellant's instructions. *Brierly v. Anaconda Company, supra.*

## Evidence of Other Complications

Appellant was not permitted to introduce evidence of Dr. Pittman's previous experience with phenol injections. Prior to the operation on Hales, Dr. Pittman had utilized the same procedure on four patients. Two of these patients, but not Hales, developed a complication known as anesthesia dolorosa. This is a constant pain which is sometimes worse than the tic douloureux which the operation is designed to eliminate. Appellant offered to prove that the failure of Dr. Pittman to inform Hales of these previous unwanted results fell below the standard of care required of a neurosur-

geon, and that had Hales known of these previous results, he would not have consented to the operation. This evidence was excluded by the court because Hales had not encountered the particular adverse effect, therefore the proposed testimony was ruled irrelevant and immaterial. Had this case been grounded solely on a malpractice theory of negligence, and had it not also included an "informed consent" battery count, the trial court would have been correct in its ruling. This dichotomy arises from the fundamental difference between the battery and the malpractice theories.

■■■■■■ As discussed in *Shetter v. Rochelle, supra,* the unauthorized touching rather than its results technically forms the basis of a battery action.

"However, if the plaintiff's claim is for 'malpractice,' whether one be considering liability in the field of negligence, or liability arising from the breach of a fiduciary duty  *  *  *  then the damages which flow from such a breach are different because the wrong is different. The operation itself in this situation is *not* the wrong, but rather the *failure to disclose*, a duty arising out of the fiduciary relationship of physician-patient [is the wrong]  *  *  *." *Id.* 2 Ariz.App. at 367, 409 P.2d at 83.

The failure of a physician to disclose a known risk does not, standing alone, constitute sufficient grounds for a malpractice action.

"No more than breach of any other legal duty does nonfulfillment of the physician's obligation to disclose alone establish liability to the patient. An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without consequence. Occurrence of the risk must be harmful to the patient, for negligence unrelated to injury is nonactionable." *Canterbury v. Spence,* 150 U.S.App.D.C. at 281, 464 F.2d at 790; *Funke v. Fieldman,* 212 Kan. 524, 512 P.2d 539 (1973).

■■■ Because the anesthesia dolorosa did not occur in Hales, Dr. Pittman's failure to disclose its possibility is not actionable under a malpractice theory. Accordingly, we believe any discussion of the anesthesia dolorosa incidents would have been collateral to the malpractice issue and could have misled the jury on the malpractice issue of whether Dr. Pittman adequately disclosed to Hales the probability of an anesthetic cornea resulting from the operation. Therefore, the evidence would have been properly excluded if this case had been tried solely on a malpractice theory of negligence. Battery, however, was also a theory, thereby rendering the evidence of the anesthesia dolorosa incidents relevant. As noted above, without an informed consent by Hales, the operation constituted a battery. *Shetter v. Rochelle, supra.*

"True consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each. The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision.  *  *  *  To the physician, whose training enables a self-satisfying evaluation, the answer may seem clear, but it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie. To enable the patient to chart his course understandably, some familiarity with the therapeutic alternatives and their hazards becomes essential." *Canterbury v. Spence,* 150 U.S.App.D.C. at 281–282, 464 F.2d at 780–781. *Cobbs v. Grant, supra.*

■■■■ In addition to the information concerning alternative procedures, the patient must understand "substantially the nature of the surgical procedure attempted and *the probable results of the operation.*"[4]

---

**4.** A physician is not required to disclose every possible minor risk associated with a proposed procedure. *Cobbs v. Grant, supra.* To do so conceivably could frighten the patient away from needed therapy or possibly result in psychosomatic ramifications. Thus, within the

(Emphasis supplied.) *Shelter v. Rochelle*, 2 Ariz.App. at 370, 409 P.2d at 86. Absent these elements, the operation becomes a battery. To properly weigh the advantages of elective surgery with its attributable disadvantages, a person needs information not only concerning the statistical probabilities of various adverse results which have been encountered by other physicians, but also one is entitled to information concerning the treating physician's experience with the particular procedure. For example, assume that as a reasonable medical probability only three percent of all patients die during a given procedure. The meaning of this statistic becomes quite another matter if Dr. "A" has never attempted the operation; Dr. "B" has performed 100 operations with a one percent mortality rate and Dr. "C" has encountered a 15 percent mortality rate in his 40 operations. Yet, if the only information given the patient was the general statistical abstract for the United States, how could that person intelligently determine which, if any, of these physicians to choose? We hold, therefore, that evidence of prior results is relevant to the informed consent issue of battery. Since appellant was prevented from introducing evidence of appellee's previous experience with phenol injections and evidence that the failure to inform Hales of these results, in addition to the general probability of encountering anesthesia dolorosa, fell below the applicable standard of care, the jury could not properly evaluate the battery count. Given these facts the jury could have found that a reasonable person, properly informed would not have consented to the operation. Therefore, the judgment is reversed for a new trial on the question of battery.

### Post-operative Care

■ Although this case primarily concerned the issue of informed consent, appellant also requested an instruction concerning the post-operative care given Hales. Appellant claimed that if Hales had received proper instructions on the care for

his anesthetic eye then he probably would not have incurred subsequent eye and facial injury. Dr. Sweet, the medical expert for the defense, agreed and testified that failure to adequately instruct a patient on the care for his eye would constitute bad practice. Although appellee did not object to this testimony, he did object to the jury being instructed on the issue of post-operative care. The trial court excluded the proffered instructions because "there was not an issue presented in the case by the pleadings, by answers to interrogatories and not by the pretrial statement". After reviewing the record, we feel the appellant adequately raised the issue. Paragraph VI of the complaint charged:

> "On or about June 9, 1971 and thereafter as long as the patient-physician relationship continued between Leland Hales and the defendants, the defendant * * * breached his duty to the plaintiffs and negligently failed to advise, counsel and inform Leland Hales, and negligently performed the surgical injection of phenol into the body of Leland Hales, *and so negligently carried out his post-operative care, advise, counsel, treatment and care of the plaintiff Leland Hales as to proximately cause serious and permanent personal injury to Leland Hales.*" (Emphasis supplied.)

Also, the pretrial statement presented the issue "Did the care and treatment given Leland Hales by Hal Pittman, M.D. between December 1, 1970 and April 26, 1972 meet acceptable standards of medical practice"? Since the operation occurred on June 9, 1971, the pretrial statement covered the post-operative period of care. The issue having been adequately raised, it was reversible error for the trial court not to instruct the jury on the issue of post-operative care. *Towers v. Johnson*, 11 Ariz.App. 455, 465 P.2d 592 (1970).

### Closing Arguments

■ Finally, appellant contends the closing arguments by appellee's attorney

broad standards we have established, we leave the precise parameters of the required disclosure for any particular case to be established

by expert testimony in accordance with the applicable standard of medical care.

breached the permissible limits and prejudiced the jury. The trial court denied appellant's motion for a mistrial, and he now requests a new trial be ordered on all issues because of the closing argument. In reviewing this matter, we are guided by two principles. First, counsel are allowed wide latitude in their closing arguments. *Beliak v. Plants*, 93 Ariz. 266, 379 P.2d 976 (1963). Also, the trial court has great discretion in controlling the conduct of the trial. If the trial court does not find that an argument unduly prejudiced the jury, then on reviewing the printed record we will not disturb its ruling absent a clear showing of prejudicial error. *Porterie v. Peters, supra.*

▆ The first of the arguments was apparently in response to appellant's closing argument which questioned the reason for certain critical testimony not being elicited from Dr. Pittman until his last appearance on the witness stand. Counsel for Dr. Pittman stated: "Well, first of all, I have my notes from the subjects that I was going to cover on redirect examination, and I checked them off with checkmarks as I covered the subjects and these subjects are as follows:" whereupon, according to appellant, counsel appeared to read his notes to the jury. The notes included questions to which objections had been sustained. This tactic can only be viewed as an attempt to corroborate the client's credibility through the attorney's unauthorized testimony. A fundamental rule of the American system of jurisprudence prohibits an attorney from testifying in a case he is handling. By utilizing this method, counsel elevated his notes to a position possibly overshadowing the evidence which had been formally and correctly presented to the jury. Such tactics cannot be tolerated.

▆ The above argument was preceded by another objectionable tactic:

"[l]awyers aren't like doctors. We really don't specialize the way doctors do. * * * But the man in this state who comes closest to being a specialist in medical malpractice cases is Norman Herring. For Norman does very little else than handle medical malpractice cases and, of course, he is extremely good. As a matter of fact if he wasn't as good as he is, he wouldn't have ever taken this case because only somebody with the skill and experience and learning and the multitude of opportunity that he's had over the years to try and elicit words that will help him, only someone with that kind of expertise could have tried to make a case out of this situation that we have here. * * *

"Since Mr. Herring's got to change the facts in order to try and win this case for Lee Hales, he has to change the facts, and he has got to say other things. It's necessary for me to review in detail many of the things that he has said and to go back to the transcript that we have and read it to you so you will see what actually the testimony was * * *.

"Norman said, for example, to you folks; you folks have been reading in the newspapers about the medical malpractice crisis, and he says it's without substance, it's froth, and, you know, I think this case is one of the prime examples of why we have a malpractice crisis that he talks about."

Although the last paragraph above may have been invited error, the remainder of the argument was uncalled for. Using an opponent's expertise as a cudgel obviously has no place in argument. We also condemn the use of accusations being hurled at an opposing counsel's veracity. Decorum in the courtroom is essential to assure clients the fairest trial possible, and we will not countenance the erosion of propriety into an atmosphere clouded by petty sniping.

▆ We note most of the foregoing remarks could have been avoided by a timely objection, rather than waiting until a recess to move for a mistrial. This fact coupled with the difficulty of assessing the impact of these improper remarks on a jury after a three week trial has led us to defer to the trial court's judgment on the matter of the closing arguments. Although this is a close issue, we were not convinced that the arguments caused a verdict which was the result of passion and prejudice. *See Builders Sup-*

*ply Corporation v. Shipley*, 86 Ariz. 153, 341 P.2d 940 (1959). However, we trust that counsel will refrain from using improper argument at the retrial of the battery and post-operative care issues.

We have declined appellant's invitation to establish a cause of action based on breach of trust for this case. Since a physician does not guarantee the results of an operation, the patient is always faced with a risk-benefit analysis. If the patient consents to the operation, he accepts the possible risks and may not complain if the risks develop. To assure the patient of all the information necessary for his decision, the law recognizes two theories for his recovery in the event he is not adequately informed. First, if the patient would not have consented to the operation had he known the nature of the procedure, the alternative procedures and the probabilities of various consequences, then the operation is a battery. Second, if the patient would not have consented to an operation had he been warned of a consequence which actually occurred, then the action is for malpractice. The cornerstone of both theories is the patient's right to control his physical integrity. So long as the decision to undergo an operation belongs to the patient, a physician should not be liable for the occurrence of risks, if the patient made an informed consent. Thus, we were not convinced this case warranted an instruction on the theory of breach of trust. Neither did we conclude that an instruction based on ordinary care was appropriate to this case, because physicians are held to a standard commensurate with their education and experience. This coupled with our review of the jury arguments has led us to affirm the judgment on the malpractice issue. On the other hand, the jury was prevented from considering the evidence concerning the anesthesia dolorosa. The exclusion of this evidence which was relevant to the battery cause of action necessitates a reversal of the judgment and a new trial on the battery issue. Similarly, appellant is entitled to a new trial on the issue of post-operative care.

Judgment of the superior court affirmed in part and reversed and remanded in part for proceedings not inconsistent with this opinion.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HAYS and HOLOHAN, JJ., concur.