685 P.2d 121

Royce A. RING and Anne L. Ring, husband and wife; James E. Rivers, Plaintiffs, Counter-defendants, Appellees,

v.

Bobby Sid TAYLOR, Defendant, Counter-claimant, Appellant.

1 CA–CIV 6144.

Court of Appeals of Arizona, Division 1, Department D.

March 1, 1984.

Review Denied June 14, 1984.

Jennings, Strouss & Salmon by M. Byron Lewis, Michael A. Beale, Jefferson L. Lankford, Phoenix, for appellees Ring.

Treon, Warnicke & Roush, P.A. by Richard T. Treon, Arthur G. Newman, Jr., Gerald J. Strick, Phoenix, for appellee Rivers.

Hofmann, Salcito, Stevens & Myers, P.A. by Leroy W. Hofmann, Phoenix, for appellant Taylor.

## OPINION

OGG, Judge.

This is an appeal by appellant Bobby Sid Taylor from jury verdicts returned in favor of appellees Anne Ring, Royce Ring and James Rivers.

For the reasons set forth below, we affirm the trial court's judgment.

We begin by briefly reviewing the facts giving rise to this matter. On April 9, 1977 at approximately 1:30 in the morning, Anne Ring was driving an Oldsmobile convertible eastbound on Maryland Avenue in the City of Phoenix. Anne's brother, James Rivers, was a passenger in the vehicle. As the Ring vehicle approached the intersection of Maryland and Central Avenues, two pickup trucks approached the intersection, both northbound on Central. Appellant Taylor was driving the pickup in the curb lane while Douglas Wistrom was driving his pickup in the inside lane. Testimony given at trial indicates that Taylor and Wistrom were driving side by side as they approached Maryland Avenue. Apparently they were "timing the lights" as they proceeded up Central. As the pickups reached the intersection, the traffic light for vehicles proceeding north on Central turned from red to green. Apparently the Ring vehicle had already entered the intersection at the time the pickups proceeded through. As a result, the Wistrom pickup collided with the Ring vehicle, thereby causing the Ring and Wistrom vehicles to collide with Taylor's pickup.

Anne Ring and James Rivers were seriously injured as a result of the collision and subsequently filed suit against both Taylor and Wistrom. Additionally, Royce Ring was listed as a plaintiff in his wife's suit, seeking compensation for loss of consortium. Prior to trial, the Ring and Rivers lawsuits were consolidated. Shortly before trial was to begin, plaintiffs and defendant Wistrom entered into a covenant not to execute upon any judgment that might be obtained against Wistrom. The covenant was apparently executed due to the fact that Wistrom had no insurance and was judgment-proof, and as a concession to Wistrom's attorney. After a lengthy trial, the jury returned verdicts in the amount of $1,300,000.00 each in favor of plaintiffs Anne Ring and James Rivers, as well as a verdict of $21,500.00 in favor of plaintiff Royce Ring. The verdicts were entered against both Taylor and Wistrom. Pursuant to the covenant not to execute, plaintiffs may look only to defendant Taylor (appellant) for satisfaction of the judgments.

## IMPROPER CONDUCT OF PLAINTIFFS RING'S COUNSEL

Appellant's first contention is that counsel for plaintiffs Ring improperly represented to the jury, during his opening statement, that he would present evidence that a Brenda Howard was in a car behind

the pickups as they approached Maryland Avenue and that she thought the light was red for northbound Central Avenue traffic at the time of the collision. Appellant claims that since Brenda Howard did not testify at trial and her written statement was not admitted into evidence, he was denied a fair trial. That portion of counsel's opening statement to which appellant objects reads in part as follows:

> ... One gal who thinks the light was red is named Brenda Howard. She was a young lady who was in the back seat, I think the back seat of a car which was also northbound on Central Avenue that night, some distance behind these two trucks who were going like this up and down Central.

> \* \* \* \* \* \*

> I suppose Mr. Hofmann is concerned because Brenda Howard, now, four years later in her deposition, will come here into the courtroom and say today: I don't remember anything about this accident. I just know that I was in the back seat of that car. She'll also tell you that at the time the accident occurred, and she was there at the scene with all the ambulances and the police, a police officer came to her and gave her a form. He said: Fill this out and tell us what happened. She'll tell you that at that time, she wrote down: I think the light was red for these trucks, but I'm not sure. She's not going to tell you she saw the light, and I wish she had and I wish I could bring her here and have her say that, but that isn't what she said at the time of the accident. She said: I was in this car and it was slowing down as it approached the light. And she said: I think the light was red, but I'm not sure....

Appellant contends that plaintiff's counsel never intended to call Brenda Howard

as a witness, knew her statement given to the police was "clearly inadmissible" and was attempting to get inadmissible evidence before the jury through his opening statement. Appellees counter by arguing that they intended to have Brenda Howard testify at trial and were planning to have the statement admitted into evidence pursuant to Rule 803(5), Arizona Rules of Evidence.[1]

We, of course, cannot ascertain what the intentions of counsel were in regard to calling Brenda Howard as a witness. We note that the record does disclose that a subpoena was issued directing Ms. Howard to appear at trial on March 5, 1981. Appellees' counsel represents that Ms. Howard did in fact appear on March 5, but was asked to return on a subsequent date due to the fact that another witness was testifying at the time she appeared. The record indicates that appellees Ring filed a written motion to have the written statement of Brenda Howard admitted into evidence which was denied upon the trial court's determination that appellees had failed to demonstrate that the witness was unavailable. *See* Rule 804, Arizona Rules of Evidence.

While it is possible that appellees' counsel never intended to call Brenda Howard to the witness stand, this very issue was presented to the trial court on appellant's motion for a new trial. The trial court was in a much better position to determine the intentions of appellees' counsel. Accordingly, we find no abuse of discretion in denying appellant's motion for a new trial. *See Reeves v. Markle*, 119 Ariz. 159, 579 P.2d 1382 (1978).

Moreover, prior to ordering a new trial due to misconduct of counsel, the trial court must determine that the improper

1. Rule 803(5) provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> \* \* \* \* \* \*

(5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

conduct actually influenced the verdict. *See Anderson Aviation Sales Company, Inc. v. Perez,* 19 Ariz.App. 422, 508 P.2d 87 (1973); Rule 59(a), Arizona Rules of Civil Procedure. Once again, the trial court is in the best position to make such a determination and, as a reviewing court, we will not disturb its ruling absent a clear showing of prejudicial error. *Taylor v. Dirico,* 124 Ariz. 513, 606 P.2d 3 (1980); *Hales v. Pittman,* 118 Ariz. 305, 576 P.2d 493 (1978). Counsel's alleged improper comments in this case fall far short of this standard. Counsel's comments indicate that Ms. Howard never saw the light, that she was in the back seat of a car northbound on Central Avenue behind the two pickups, and that she thought the light was red because the car she was in was slowing down. Viewing these comments in the context of a lengthy trial of more than three weeks, the trial court's conclusion that any improper conduct on the part of counsel did not influence the jury's verdict is clearly supported by the record, especially in light of the fact that the jury was instructed that the remarks of counsel were not to be considered as evidence.

Therefore, we conclude that the trial court did not abuse its discretion in denying appellant's motion for a new trial, regardless of counsel's intentions in commenting on Brenda Howard's testimony or written statement, neither of which was subsequently admitted into evidence.

## TESTIMONY OF PATRICIA ALLEN

Appellant also alleges error warranting a new trial based upon the testimony of one Patricia Allen. Appellant claims that the trial court erred in: (1) not permitting appellant to impeach Ms. Allen with a prior recorded statement; (2) denying appellant's request to depose Ms. Allen prior to her testifying; and (3) permitting Ms. Allen to opine that appellant and Douglas Wistrom were "racing".

## A. PRIOR STATEMENT

We consider first the prior recorded statement. The statement in issue was obtained by an agent of appellant's insurance carrier via a phone conversation with Patricia Allen conducted on August 23, 1979. Appellant failed to disclose the existence of the recorded statement when specifically requested, through subsequent interrogatories, to divulge the existence of "any written or recorded statement made by any party or witness". There is no question that Ms. Allen was a witness to the accident.

Appellees moved *in limine* to have any use of the undisclosed statement by appellant's counsel barred when they learned, through Patricia Allen, that the statement had been taken. The oral motion was made on March 11, 1981, after trial had commenced and the day before Ms. Allen was scheduled to testify.

Appellant claims that he was not required to divulge the statement since it was to be used to impeach Patricia Allen. *See* Rule VI(a)(1), Uniform Rules of Practice of the Superior Court of Arizona.[2] Appellees counter by arguing that the statement was to be used in an attempt to contradict Ms. Allen's testimony on a substantive issue and was therefore discoverable. *See Helena Chemical Company v. Coury Brothers Ranches, Inc.,* 126 Ariz. 448, 616 P.2d 908 (App.1980); *see also, Zimmerman v. Superior Court,* 98 Ariz. 85, 402 P.2d 212 (1965). Additionally, appellees point out that the proper procedure to follow would have been to state an objection to the interrogatory, rather than give an incomplete answer. *See* Rule 33(a),

---

**2.** Rule VI(a)(1) provided, at the time of trial:

(a) Pretrial statements. Counsel who will try the civil cases for the parties and who are authorized to make binding stipulations shall meet personally, and prepare a written pretrial statement, signed by each counsel, to be filed with the court within the time set by the court in the particular case, or by the applicable Local Rules of Practice, or if no time is set, then not less than two days prior in the date of trial. Such pretrial statement shall contain the following:

(1) That all exhibits and a list of witnesses intended to be used at trial have been exchanged (other than those to be used for impeachment).

Arizona Rules of Civil Procedure. However, we find it unnecessary to rule on the merits since we conclude that appellant has failed to object to the trial court's ruling denying him use of the statement, thereby waiving any possible error in the ruling.

A close review of the in-chambers proceedings of March 11, 1981 clearly establishes acquiescence on the part of appellant's counsel to the trial court's ruling on the statement. The existence of the statement was first brought to the trial court's attention by counsel for appellee Rivers. After indicating that Patricia Allen had informed him that appellant's insurer had told her that they had a statement that she supposedly had given to them sometime in the past, the following conversation took place:

MR. NEWMAN: ... We had asked Taylor [appallant] whether there were any statements, any witness statements that they were aware of and although they listed some, they listed nothing in any regard to Patty Allen. So we will be moving in limine to bar Defendant Taylor from making any reference to this statement that we've never seen, if such a statement exists.

THE COURT: Is there a statement?

MR. HOFMANN: Yes, it was taken *after* the interrogatory was answered. I'm interested to hear this.... (emphasis added)

At this point appellant's counsel acknowledges the existence of Ms. Allen's statement but asserts that it was taken *after* the interrogatory requesting disclosure of statements was answered. Counsel for appellee Rivers then acknowledged that the date upon which appellant submitted his answers to appellee's interrogatories might be significant:

MR. NEWMAN: I'm not sure what all that means. Obviously, we'll look at the date of the statement. We sent out interrogatories. We will have dates on when the answers were and I believe we requested supplementations right before trial. So I don't think that part of it will enter into it. Any statement has been—

well, if it turns out that they took it after our interrogatories then that will be a different matter and we'll have to see the date on the statement and you can review the interrogatories....

Later that day counsel again met in chambers whereupon the following discussion took place:

MR. NEWMAN: Partially in response, Your Honor, I did check their interrogatory answers and they were answered by Mr. Hofmann in April, 1980. The statement's stated [sic] sometime in 1979 so there is a non-disclosure of that statement in the record and so we do strongly take the position that they, having never told us about the statement, they can't use it.

\* \* \* \* \* \*

THE COURT: You say the interrogatory requesting witness statements was served in 1980?

MR. NEWMAN: The answers were served in 1980.

THE COURT: And the statement was taken in 1979?

MR. NEWMAN: Yes....

MR. HOFMANN: Your Honor, we're talking about apples and oranges. First of all, *I have no quarrel with what Mr. Newman said.* If I did not disclose the statement, I'm sorry. *What he says is true* and I apologize. And I represent to the Court that it was oversight and I wouldn't hide anything like that intentionally. I value my license too much. But—

THE COURT: The rule on the statement, then, will be the same essentially as the rule on his pictures not disclosed, not used. So *you can't use the statement to cross-examine her.* He couldn't use the pictures.

MR. BEALE: On behalf of—

MR. HOFMANN: *I've got no particular quarrel with that.* (emphasis added).

It is clear that appellant's counsel did not object to the court's ruling and, in fact, acquiesced in the ruling. On appeal, appel-

lant now asserts that he intended to use the statement solely for impeachment. Such assertion was not made in the trial court, accordingly we will not consider it on appeal. *Van Dever v. Sears, Roebuck & Company*, 129 Ariz. 150, 629 P.2d 566 (App.1981); *Tryon v. Naegle*, 20 Ariz.App. 138, 510 P.2d 768 (1973).

## B. FAILURE TO ALLOW DEPOSITION

Appellant also claims that the trial court erred in not allowing his counsel to depose Patricia Allen prior to her testifying. Appellant made his request to depose Ms. Allen on March 11, 1981, the day before she was scheduled to testify and a week into the trial.

Appellant maintains that the trial court's ruling constitutes a gross abuse of discretion and violated fundamental concepts of due process and fairness. Appellant points out that Patricia Allen was in the Navy and had been stationed at a remote naval base in the Aleutian Islands of Alaska for the year prior to the date upon which she testified. Additionally, appellant notes that Ms. Allen was flown into Phoenix by appellees on the date she was originally scheduled to testify. Appellant further alleges that Ms. Allen was "hidden out" by appellees upon her arrival in Phoenix until the time came for her to testify.

Appellees agree that Ms. Allen was flown into Phoenix at their expense while she was in transit to a new duty station in San Diego, California. Appellees acknowledge that she was flown in on March 12, 1981, the date she was originally scheduled to testify. Appellees deny the allegation that Ms. Allen was "hidden out" by them. Appellees assert that Ms. Allen arrived at the office of attorney Treon on the morning of March 12. After talking to Treon for about 30 minutes, she rested in Treon's office awaiting the call to testify. The testimony of Lamont Skousen took longer than expected and Ms. Allen could not testify on the 12th. Appellees assert, and the testimony of Patricia Allen corroborates, that Ms. Allen spent the evening of March 12 with her brother and sister-in-law. On the morning of March 13, the testimony of Lamont Skousen was interrupted so that Ms. Allen could testify and not miss her flight to San Diego.

 We find that appellant's allegation that Patricia Allen was "sequestered" or "hidden out" by appellee Rivers' counsel is without merit. The record is devoid of any request by appellant's counsel to speak to Ms. Allen prior to her testifying. When denied the opportunity to depose, counsel chose not to request an opportunity to speak to or question Patricia Allen before she testified.

The in-chambers proceedings of March 11, 1981 indicate concern on the part of the trial court in regard to the possibility that appellant was not able to depose Ms. Allen because she was unavailable for at least one year before trial. However, once the court discovered that appellant's counsel did not know that Ms. Allen was stationed in Alaska, he decided not to allow the deposition:

> THE COURT: The only question I've got is generally speaking if I were to chart out discovery in most cases, it goes from the beginning of the case as you get closer to trial, you suddenly see a scale up and you know if the girl's been unavailable for a significant period of time.

> MR. BEALE: Judge, here's the point. They've never made an effort to depose her. They didn't know she was in the Allutian [sic] Islands. It's only because of the posture of this case as developed in the trial that they've even evidenced any interest in deposing her and it's too late. The rules don't provide for that type of discovery. . . .

> \* \* \* \* \* \*

> THE COURT: When did you learn she was in the Allutian [sic] Islands?

> MR. HOFMANN: I learned it—it would be when I—it was of record here, I think.

> MR. TREON: *You learned it in our opening statement* when Mike stated that you'll hear from Patricia Allen who

is in the Allutian [sic] Islands and who is going to be a witness in this case.

MR. HOFMANN: *That's exactly right. I agree.*

THE COURT: Okay. That really crushes the thought that I had before. My thought before was that, you know, if, obviously the woman is unavailable for a period of time and that is known, and for that reason, people don't attempt discovery. That's one thing. I think because of what's in an opening statement that causes you reason for alarm, I don't think it's sufficient cause in the middle of a trial to cause the deposition of the witness to be taken. (emphasis added)

■ The record clearly indicates the fact that Patricia Allen was to be called as a witness was disclosed to appellant prior to trial. She was listed as a witness in appellees Ring's answers to interrogatories and in the joint pretrial statements of the parties.[3]

Rule V(f), Uniform Rules of practice of the Superior Court[4] provides:

(f) Additional Discovery. No party may undertake any pretrial procedures under Rules 26 to 37 of the Rules of Civil Procedure ten days before the trial, or thereafter, except that the court *may,* for good cause shown, such as the continuous absence from the state of a non-resident party, enter an order allowing such discovery procedures to be undertaken anytime prior to trial. (emphasis added).

■ The trial court is vested with wide discretion in controlling the proceedings during trial, *see Taylor v. Dirico, supra; Hales v. Pittman, supra,* as well as the taking of additional discovery at trial. *See Dykeman v. Ashton,* 8 Ariz.App. 327, 446 P.2d 26 (1968). Its decision will not be disturbed on appeal, absent a clear abuse

of discretion. *Taylor v. Dirico, supra; Dykeman v. Ashton, supra.* Under the facts of this case, we find no abuse of discretion.

## C. TESTIMONY THAT TRUCKS WERE "RACING"

■ Appellant's last contention, as regards Patricia Allen's testimony, is that she was improperly permitted to give her opinion that the pickups were "racing". Although it is clear that Patricia Allen's opinion that the pickups were "racing" was proper under Rule 701, Arizona Rules of Evidence, we need not reach the merits of this claim because appellant has failed to make a proper objection below. The following clearly demonstrates that appellant's counsel never objected on the grounds that Ms. Allen's opinion was improper:

Q. (BY MR. TREON) Can you help us out to understand? You indicated the pickup trucks were kind of jockeying back and forth as they went up Central.

A. Yes.

\* \* \* \* \* \*

Q. I'd like to talk a little more about this back and forth business. Can you sort of paint a word picture for us as to what the vehicles were doing, the pickup trucks?

A. Like the one on the left would go ahead and the one on the right would maybe catch up and maybe pull up just a little bit farther, and the one on the left would make sure that he pulled up just a little bit ahead of each other; that they kept going back and forth.

Q. Did you form any impression or opinion in your mind that, as you ob-

---

**3.** Moreover, having carefully reviewed both the transcript of the recorded telephone statement of Patricia Allen and her trial testimony, we find few, if any, inconsistencies. Contrary to appellant's contention, Ms. Allen's testimony does not vary significantly from her prior statement. Rather, her testimony is simply more specific and detailed than the recorded statement, something to be expected when one has the opportunity to reflect and think back prior

to taking the witness stand. Hence, appellant's counsel was on notice as to what Patricia Allen's testimony would be despite his claim that she became a "surprise star witness".

**4.** Rule V was amended July 6, 1983, effective September 7, 1983. The quoted version is that in effect at the time of trial.

served what they were doing, what they doing? [sic]

MR. HOFMANN: Objection, *irrelevant.*

THE COURT: You may testify to what you observed.

Q. (BY MR. TREON) Go ahead. What did you observe?

A. I would call it racing, but that's my opinion. (emphasis added)

Counsel's objection on the basis of relevancy was not sufficient to permit the court to consider the claim appellant now raises on appeal. Accordingly, we refuse to consider this claim. *Nielson v. Flashberg,* 101 Ariz. 335, 419 P.2d 514 (1966); *Van Dever v. Sears, Roebuck & Company, supra.*

### GALLAGHER COVENANT

Appellant's next contention is that the trial court erred in not admitting into evidence the covenant not to execute between appellees and co-defendant Douglas Wistrom. Appellant cites as authority the cases of *City of Tucson v. Gallagher,* 108 Ariz. 140, 493 P.2d 1197 (1972), and *Sequoia Manufacturing Company, Inc. v. Halec Construction Company, Inc.,* 117 Ariz. 11, 570 P.2d 782 (App.1977).

Initially we must determine whether the covenant not to execute constitutes a so-called "Gallagher" agreement. *See Mustang Equipment, Inc. v. Welch,* 115 Ariz. 206, 564 P.2d 895 (1977); *City of Tucson v. Gallagher, supra.* In *Sequoia, supra,* this court held:

> The clear intention of the Arizona Supreme Court in *Mustang Equipment, Inc. v. Welch, supra,* is to include in the "Gallagher" category all covenants, assuming the requisite elements of consent and consideration are present, involving plaintiffs and settling co-defendants, even if there is no agreement or incentive to sabotage the non-agreeing defendants or to enhance the plaintiffs' total verdict or verdict against the non-agreeing defendants.

117 Ariz. at 24, 570 P.2d 782. It is clear that appellees and co-defendant Wistrom

"consented" to the covenant not to execute, therefore we need only determine whether there was "consideration" for the agreement. In *Mustang Equipment, supra,* the Arizona Supreme Court noted that "[c]onsideration consists of a benefit to one party *or* a detriment to the other." (emphasis added). 115 Ariz. at 209, (citing *Grant v. White,* 103 Ariz. 257, 439 P.2d 828 (1968)). However, the consideration must be mutual, *see Mustang Equipment, supra,* that is, each party must either confer upon the other a benefit, or incur a detriment. It is clear that Wistrom has been benefited by the covenant not to execute. He was relieved of any financial responsibility should the jury return a verdict against him. We must now consider what consideration, if any, flowed to appellees as a result of entering into the covenant not to execute.

Initially it would appear that appellees have received no benefit, nor has Wistrom incurred any detriment in executing the covenant. Wistrom is relieved of liability, regardless of any verdict the jury might reach. The covenant purportedly requires that Wistrom remain as a named defendant and testify at trial. Wistrom, however, was a named defendant at the time the covenant was entered into so that no benefit or detriment flows as a result of his remaining as a defendant. Since Wistrom had been subpoenaed, he was legally required to testify truthfully at trial, therefore the agreement to testify cannot constitute consideration since Wistrom was under a preexisting duty to testify. *See Leone v. Precision Plumbing and Heating of Southern Arizona, Inc.,* 121 Ariz. 514, 591 P.2d 1002 (App.1979).

However, considering the realities of litigation, it does appear that appellees have received a benefit in entering into the covenant. Having released Wistrom from any potential financial liability, appellees have significantly reduced Wistrom's interest in vigorously defending the lawsuit. In fact, under the terms of the covenant, it would make little difference whether or not a verdict against him was returned by the jury. This is evidenced by the fact that

Wistrom's counsel withdrew after the covenant was executed. In effect, appellees have increased their likelihood of prevailing at trial by reducing the zealousness of one of their trial adversaries. Hence, we conclude that appellees were conferred a benefit by entering into the covenant not to execute. Having concluded that the requisite elements of consent and mutual consideration are present, we find that the covenant constitutes a "Gallagher" type agreement. *See Sequoia, supra.*

We must now determine whether the trial court erred in not admitting the covenant into evidence. The *Sequoia* case is dispositive of this issue. In *Sequoia* we noted that there are certain instances in which the trial court would be required to admit "Gallagher" agreements into evidence:

> We believe there are clearly circumstances in which *Gallagher* agreements should be admitted into evidence or made known to the jury by way of instruction, for limited purposes. The classic situation wherein this would not only be permissible but probably obligatory if requested by the non-agreeing party, is where the agreeing defendant *can improve his financial position by insuring a verdict of a certain amount, or over a certain amount against the non-agreeing defendant.* (emphasis added).

117 Ariz. at 23, 570 P.2d 782.

This is clearly not the situation in the case at bar. Wistrom could in no way improve his financial position depending upon the amount of a verdict returned against appellant. Wistrom was off the hook for any verdicts returned regardless of whom they might be returned against or for whatever amounts. This is not a case in which the trial court was required to admit the agreement into evidence or divulge its existence to the jury.

Where, as in the case at bar, there are allegations of fraud and collusion, the decision of whether or not to admit the agreement is left to the "considerable discretion" of the trial court:

> [W]e believe a trial court is in a unique position to view the factors surrounding

such an agreement and to decide, when requested, whether such an agreement should be admitted. The record in this case reflects the wisdom of such a holding. The trial court was aware of all the adverse possibilities inherent in the existence of the agreement and was fully prepared to impose sanctions, if necessary, to prevent injustice, up to and including admitting the agreement into evidence. After observing the conduct of all counsel, their demeanor, their witnesses, and the overall atmosphere of the courtroom, the trial judge determined it unnecessary in this case to disclose the agreement to the jury. In an instance such as this, we invest the trial court with considerable discretion.

117 Ariz. at 24, 570 P.2d 782.

As in *Sequoia,* the trial court clearly indicated on the record his reasons for not admitting the agreement into evidence:

> [F]rom the moment that I heard of the agreement, I anticipated that this moment would come in the course of the trial. I am sure that the agreement would, at one point in the trial, be offered and so from the very outset, when I first learned of the agreement, I carefully observed the testimony of Wistrom for this reason. I think if the covenant were to come in, there are other repercussions which he had that that covenant would bring out. The jury could derive from the covenant, among other things: 1) that the plaintiffs may feel there's no liability against Wistrom; 2) that there's no insurance; in other words, their reasons for making the agreement may be many. It may be because they feel they don't have a case, which the jury may conclude; it may be that, and probably the reason in this case is that there's no insurance which the jury could not be told and there may be an inference that somehow the defendant is now going to help the plaintiff because of this agreement. It was on this, the third ground that I particularly paid attention to Wistrom's testimony, to see if, in fact, you had a genuine Gallagher type situation

where you've got a person cloaked as a defendant who is, in reality, has an interest in the outcome for the plaintiffs. That was not present in this case.

Second of all, I don't believe, from my observation of the testimony and acknowledging the fact that you contend it's not a standard, I feel that it's significant in trying to balance whether or not the covenant should be admitted, whether or not Wistrom's testimony significantly varies from the covenant, is entered from the testimony before. And my observations at the trial were that it did not, in any significant way, vary.

█ Based upon the trial court's findings and our review of the record, we find no abuse of discretion in not admitting the covenant not to execute into evidence.

## IMPROPER ARGUMENT OF PLAINTIFF RIVERS' COUNSEL

Appellant's next contention is that he was denied a fair trial due to counsel for appellee Rivers improperly commenting in his closing argument upon a portion of the opening statement of appellant's counsel which was stricken from the record.

During his opening statement, appellant's counsel told the jury that medical evidence would be presented establishing that appellant had both an active peptic ulcer and a hiatus hernia, making it virtually impossible for appellant to hold alcohol in his stomach. Appellant was precluded from introducing the medical evidence, apparently due to a failure to disclose the medical expert witness prior to trial. Accordingly, on the afternoon of March 5, the trial court instructed the jury to disregard that portion of counsel's opening statement pertaining to the alleged ulcer and hernia.

During direct examination, appellant testified that he had a hernia and that drinking beer seriously irritated his stomach. Appellant was permitted to testify from his own personal knowledge concerning the alleged hernia. No medical evidence pertaining to the alleged hernia or ulcer was presented.

Appellant contends that the following excerpt from the closing argument of counsel for appellee Rivers was improper:

I think Lee Hofmann is a super guy, a perfect gentleman and a heck of a lawyer and he's a pleasure to be in Court with, by and large.... I like him, I do, as an attorney. I have to tell you, he took a few cheap shots and he suggested evidence that wasn't in the record and he asked questions where he knew there wasn't going to be evidence to support his questions. When he raised his questions, I could feel all of you coming out of your seats. What about that? The next thing you know, it's gone. It's like the deep lung breath, whatever they call it, and the leaky capsule. Both of those work out in our favor and et cetera, et cetera. I can't let this sit without focusing you in on something he said in his very opening statement, something that His Honor then told you to forget about, unring the bell. As you just heard, I'm going to ring it again.

MR. HOFMANN: No you're not. Your Honor, if you struck that, he's not going to refer to a portion of the evidence that you struck.

THE COURT: I will sustain the objection.

MR. HOFMANN: Thank you.

MR. TREON: He got me again. How am I going to handle this? I just want to say this: He put thoughts in your mind that there was no evidence for and I just don't know how to go in there and wipe out these thoughts. That's my problem. His Honor did strike them. He did tell you to forget about them and I take the risk by raising it again that you'll somehow or another have it come back in your mind. But there was no evidence really to connect up all of this alleged problem that Bobby Sid had with his ulcer and hiatal hernia.

MR. HOFMANN: Your Honor, I object. I was prevented from introducing that evidence at Mr. Treon's motion. I object; that's improper argument.

THE COURT: The jury was instructed to disregard that portion of the opening argument that was made by Mr. Hofmann and there's no evidence of that and the jury is instructed to disregard that, and I'll sustain the objection.

MR. HOFMANN: Thank you, Your Honor.

MR. TREON: Then if Mr. Hofmann is so eager to have it out, forget about his hiatal hernia and forget about his ulcer because there is proof [sic] to support one bit of it and no proof to support this kid couldn't drink beer. We know he could.

Appellees contend that counsel was merely pointing out the fact that there was no medical testimony to support appellant's contention that he suffered from a hiatus hernia, since appellant himself testified to the existence of the hernia. Appellees further contend that they were justified in making the above argument in light of misconduct on the part of appellant's counsel in his opening statement, thereby "opening the door" to a response.

■ We reject both contentions. Although appellees claim that the comment was proper to rebut appellant's own testimony that he suffered from a hiatus hernia, the point is that the comments were made *after* objections by appellant's counsel were *sustained.* If counsel disagreed with the court's ruling in regard to the propriety of his comments, it was incumbent upon him to present his reasoning to the court at the time the objection was ruled upon. It was clearly improper to disregard the court's ruling and continue on with his comments concerning the lack of medical testimony. Having failed to present this argument to the trial court, we refuse to consider it on appeal. *Van Dever v. Sears, Roebuck & Company, supra.* Appellees' contention that appellant's counsel "opened the door" to a response fails for the same reason. We find that counsel's repeated comments upon matters pre-

viously excluded from evidence were improper.

However, as noted earlier, improper conduct on the part of counsel does not constitute automatic grounds for a new trial. It must be determined that the improper conduct actually influenced the verdict. *See Anderson Aviation Sales Company, Inc. v. Perez, supra;* Rule 59(a), Arizona Rules of Civil Procedure. The trial court is in the best position to make such a determination and we will not disturb its ruling absent a clear showing of prejudicial error. *Taylor v. Dirico, supra; Hales v. Pittman, supra.*

We find no abuse of discretion in the trial court's denial of appellant's motion for a new trial based upon the improper conduct. The trial court properly instructed the jury not to consider that portion of appellant counsel's opening statement pertaining to medical evidence. Moreover, taken in the context of the entire trial, the comments were not of sufficient magnitude that they were likely to influence the verdict. *See Grant v. Arizona Public Service Company,* 133 Ariz. 434, 652 P.2d 507 (1982).

## INSTRUCTION ON A.R.S. § 28–692

Appellant next contends that the trial court erred in instructing the jury on the applicability of A.R.S. § 28–692[5] and the negligence per se doctrine. It appears that appellant raises on appeal two distinct allegations of error regarding this issue.

## A. SUFFICIENCY OF EVIDENCE WARRANTING INSTRUCTION

Appellant's first contention is that the trial court erred in instructing the jury on A.R.S. § 28–692(B)(3), which creates a presumption that a person is under the influence of intoxicating liquor if "at that time" he has .10 percent or more by weight of alcohol in his blood. Appellant points out that his blood alcohol reading was only .03 percent when a breath sample was taken approximately five hours after the accident. Based upon the .03 percent reading, appellant maintains there was no basis

---

**5.** A.R.S. § 28–692 was subsequently amended by Laws 1978, ch. 207, § 1 and Laws 1982, ch. 234,

§ 7. The version of the statute discussed herein was that in effect at the time of the accident.

upon which to instruct the jury on the presumption of intoxication attributable to a reading of .10 percent or greater. Apparently it is appellant's contention that the words "at that time" refer to the blood alcohol content at the time the test is administered. We disagree.

A.R.S. § 28–692 provides in pertinent part:

> A. It is unlawful and punishable as provided in § 28–692.01 for any person who is under the influence of intoxicating liquor to *drive or be in actual physical control* of any vehicle within this state.

> B. In the trial of any *civil* or criminal action or proceeding for a violation of subsection A of this section relating to driving or being in actual physical control of a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the defendant's blood *at the time alleged* as shown by chemical analysis of the defendant's blood, urine, breath or other bodily substance shall give rise to the following presumptions:

> \* \* \* \* \* \*

> 3. If there was *at that time* 0.10 per cent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor. (emphasis added).

It is clear that the words "at the time alleged" in subsection B and "at that time" in subsection B(3) refer to the time of the alleged offense, that is, the time a defendant was driving a motor vehicle. *See Jackson v. City of Roanoke*, 210 Va. 659, 173 S.E.2d 836 (1970). Normally this would be the time a defendant was stopped by a law enforcement officer; in this case it would be the time of the accident. *See Gibson v. Boyle*, 139 Ariz. 512, 679 P.2d 535 (App.1983). Therefore, provided there was sufficient evidence to indicate that appellant's blood alcohol level was .10 percent or greater at the time of the accident, the

instruction on A.R.S. § 28–692(B)(3) was proper.

Appellees presented the testimony of Eric B. Volcheff, a criminalist, formerly with the Phoenix Crime Laboratory. Mr. Volcheff testified that he analyzed a breath sample which was taken from appellant approximately five hours after the accident. His analysis indicated that appellant had a blood alcohol reading of .03 percent five hours after the accident. Subsequently, William J. Collier, a criminalist and toxicologist, testified that, based upon a blood alcohol reading of .03 percent five to six hours after appellant had stopped drinking, his blood alcohol reading at the time of the accident would have been at least .105 percent and likely higher. Mr. Collier testified that he reached this conclusion through the process of retroactive extrapolation, a process whereby a minimal alcohol elimination rate of .015 percent an hour is used to determine what a blood alcohol rate was at a specified time prior to the taking of a breath sample.[6] There clearly existed sufficient evidence to warrant instruction on the statutory presumption under A.R.S. § 28–692(B)(3).

## B. PRESUMPTION OF INTOXICATION AND NEGLIGENCE PER SE DOCTRINE

Appellant's second argument pertaining to the propriety of the court's jury instructions on A.R.S. § 28–692 is that the court failed to inform the jury that the statutory presumption of intoxication under A.R.S. § 28–692(B)(3) is rebuttable and not conclusive. Coupled with the trial court's instruction on negligence per se, *see Smith v. Chapman*, 115 Ariz. 211, 564 P.2d 900 (1977), and *Starr v. Campos, supra,* appellant contends the effect of the court's instructions would be to require the jury to find that appellant was negligent as a matter of law if they found that his blood alcohol level was .10 percent or greater.

---

**6.** This is merely a generalized statement of the process. Suffice it to say that the process has achieved general acceptance in the scientific field. *See State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981); *Starr v. Campos,* 134 Ariz. 254, 655 P.2d 794 (App.1982).

We have carefully reviewed the record before us and find that no such objection was made by appellant in the trial court, nor were any instructions regarding the rebuttable nature of the presumption offered by appellant. Once again, we refuse to consider this argument on appeal due to appellant's failure to raise it in the trial court. *Van Dever v. Sears, Roebuck & Company, supra.*

Accordingly, we find no error as regards the trial court's instructions to the jury on the applicability of A.R.S. § 28–692 and the negligence per se doctrine.

### INSTRUCTION ON A.R.S. § 28–645(A)(1)(a)

Appellant's final argument is that the trial court erred in its instruction to the jury on A.R.S. § 28–645(A)(1)(a).[7] Appellant contends that the court erred in excising from its instruction the following bracketed language:

> Vehicular traffic facing a green signal may proceed straight through or turn right or left unless a sign at the place prohibits either turn. Vehicular traffic, including vehicles turning right or left, shall yield the right of way to other vehicles [and to pedestrians] lawfully within the intersection *or* an adjacent crosswalk at the time the signal is exhibited. (emphasis added)

Appellant takes the position that exclusion of the reference to pedestrians renders the instruction an erroneous statement of the law. Appellant argues that the clear meaning of the statute requires the driver with a green light to yield to *pedestrians* lawfully *in an adjacent crosswalk* and *vehicles* lawfully *in the intersection.* Such a reading would give the "other vehicle" (appellees') the right of way only if they had entered the intersection[8] prior to the change of the light. Had the vehicle passed into the crosswalk, but had not yet reached the intersection, appellant would not be required to yield the right of way.

Appellant's interpretation of the statute is contrary to the plain and natural meaning of the language used in the statute. The words "vehicle" and "pedestrians" are joined by the word "and". The word "and" is a conjunction connecting words or phrases expressing the idea that the latter is to be added or taken along with the first. *In re Rapid Film Service, Inc.,* 181 Neb. 1, 146 N.W.2d 563 (1966). Use of the disjunctive "or" between "intersection" and "adjacent crosswalk" indicates that the two phrases joined are coordinate, that is, either is applicable to any situation to which its terms relate. *See Yell v. Garrett,* 19 Ariz.App. 3, 504 P.2d 544 (1972); *Matter of Adoption of Voss,* 550 P.2d 481 (Wyo.1976). Thus the plain and ordinary meaning of the statutory language is that vehicular traffic must yield to both vehicles and pedestrians within *either* the intersection *or* the adjacent crosswalk at the time the traffic signal turns to green.

The cardinal principle of statutory interpretation is that we must follow the plain and natural meaning of the statute to determine what the legislature intended. *State v. Arthur,* 125 Ariz. 153, 608 P.2d 90 (App.1980). Words and phrases in statutes will be given their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended. *McIntyre v. Mohave County,* 127 Ariz. 317, 620 P.2d 696 (1980). It is appellant's position that, when read in conjunction with those subsections of the statute pertaining to red and yellow light signals, the aforementioned language should not be given its ordinary meaning.

A.R.S. § 28–645(A)(3)(a) provides:

> Vehicular traffic facing a steady red signal alone shall stop at a clearly marked stop line, but if none, then *before entering the crosswalk* on the the near side of the intersection or *if none, then before entering the intersection,* and

---

7. A.R.S. § 28–645 was amended by Laws 1980, ch. 178, § 1. The portions of the statute discussed herein are those effective at the time of the accident.

8. A.R.S. § 28–602 defines "intersection" as "the area embraced within the prolongation or connection of the lateral curb lines ..."

shall remain standing until an indication to proceed is shown ... (emphasis added).

Appellant contends that this subsection of the statute directs a driver *where* to stop, but does not permit a vehicle which has entered the crosswalk prior to the light turning red to proceed through the intersection. It is appellant's contention that the yellow light subsection of the statute controls at which point a motorist is not to proceed when the traffic signal changes to red. The yellow light signal, A.R.S. § 28–645(A)(2)(a), provides:

> Vehicular traffic facing a steady yellow signal is thereby warned that the related green movement is being terminated or that *a red indication will be exhibited immediately thereafter when vehicular traffic shall not enter the intersection.* (emphasis added).

While it is true that appellant presents a possible interpretation of subsection (A)(1)(a) (red light subsection), we choose to interpret the subsection consistently with the green light subsection. Appellees point out that the red light signal subsection of the statute is consistent with the green light subsection if read to indicate at which point a vehicle is to stop as it approaches a traffic light which turns to red. Such a reading would require a vehicle approaching a traffic signal that turns to red to stop before entering a crosswalk, if there is no stop line; however, if there is a crosswalk and the light changes to red while *in the crosswalk,* the vehicle may proceed through the crosswalk and intersection.

As concerns appellant's contention that the yellow light subsection of the statute controls, it is more logical to rely on the red light subsection in determining at which point a vehicle may not proceed through an intersection when a red light is displayed.

█ Accordingly we conclude that A.R.S. § 28–645(A)(1)(a) requires vehicular traffic facing a green signal to yield to other vehicles lawfully within the intersection or an adjacent crosswalk at the time the signal turns to green. Since no pedes-trians were involved in the accident, the trial court did not err in deleting the words "and to pedestrians" from its instruction. The deletion in no way prejudiced appellant.

For the foregoing reasons the judgment of the trial court is affirmed.

HAIRE, P.J., and FROEB, J., concur.