NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ELTON JARDINES, *Petitioner*,

*v.*

THE HONORABLE JENNIFER RYAN-TOUHILL, Judge of the
SUPERIOR COURT OF THE STATE OF ARIZONA, in and for the County
of MARICOPA, *Respondent Judge,*

STATE OF ARIZONA, *Real Party in Interest*.

No. 1 CA-SA 21-0073
FILED 7-1-2021

Petition for Special Action from the Superior Court in Maricopa County
No.  CR2009-136653-001
The Honorable Jennifer Ryan-Touhill, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED**

COUNSEL

Alcock & Associates, P.C., Phoenix
By David Le Lievre
*Counsel for Petitioner*

Maricopa County Attorney's Office, Phoenix
By Jeffrey Duvendack, M. Desi Rubalcaba
*Counsel for Real Party in Interest*

---

## MEMORANDUM DECISION

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie joined. Judge Cynthia J. Bailey dissented.

---

**W I N T H R O P**, Judge:

**¶1** The State charged Elton Jardines with two counts of first-degree murder and two counts of aggravated assault. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 13-1105, -1203, -1204. Jardines' trial ended after the respondent judge *sua sponte* declared a mistrial over Jardines' objection. Jardines then moved to dismiss the charges against him, claiming that a retrial would violate the constitutional prohibition against double jeopardy. The trial court denied the motion. Jardines petitioned this court for special action relief, arguing double jeopardy bars his retrial. For the following reasons, we accept jurisdiction and grant relief.

### FACTS AND PROCEDURAL HISTORY[1]

**¶2** In May 2009, a fight between two groups of people outside a convenience store became deadly when someone pulled a gun and began shooting. Four people were shot, and two died. Jardines was present at the scene.

**¶3** As part of their investigation, police interviewed witnesses and victims to identify the shooter. Two witnesses/victims, A.B. and S.M.,

---

[1] We agree with our dissenting colleague that the record provided this court is sparse. Nevertheless, we do not believe the lack of additional record in this case precludes us from accepting jurisdiction and granting relief. At oral argument, this court questioned Jardines' counsel about the meager record provided, and counsel avowed that no material facts were in dispute. Counsel for the State did not quarrel with this avowal and affirmatively stated that the State did not dispute the facts as set forth in Jardines' petition. Further, even after this court raised the issue, neither side offered, either at oral argument or subsequently, to supplement the record before this court, indicating that both sides believed all material facts before the trial court for consideration had been presented to this court as well.

stated in part that they believed a person who had been identified as "Alex" was the shooter and the shooter had "Biggums" or "something with a B" tattooed on one of his arms or right bicep. Neither witness picked Jardines out of a photo lineup at the time, although A.B. came close, stating "I want to say [Jardines' photo]," before ultimately rejecting all the photos shown to her.

¶4         The State eventually charged Jardines with the crimes, but Jardines fled to Mexico. After several years, Jardines was located and arrested, and his trial began in March 2021.

¶5         Jardines' primary defense was misidentification, and he sought to impeach the testimony of both A.B. and S.M. by showing the tattoo on his right arm was different from the shooter's tattoo as previously described by either A.B. or S.M. During opening statements, defense counsel told the jury that witnesses would testify about a tattoo that was on the shooter, and that Jardines had no such tattoo.

¶6         On the afternoon of the first day of testimony, the second witness called by the State was S.M. For the first time, S.M. described the shooter's tattoo as having identifying characteristics much the same as the tattoo on Jardines' right arm.

¶7         Defense counsel asked for a sidebar conference, explained he believed this information had not previously been disclosed,[2] and asked to *voir dire* S.M. outside the jury's presence. The trial court agreed. S.M. then explained no one had ever thoroughly questioned her about the shooter's tattoo before, and she denied receiving any further information about the tattoo before her testimony. She conceded she had been to court once before, although "it was a long time ago," and had previously seen Jardines in court. She also stated she had previously spoken to someone about the case but was unsure if that person was a prosecutor.

¶8         The trial recessed for the evening, and defense counsel then emailed the prosecutor asking if S.M. had been allowed to see photographs of Jardines' tattoos in advance of trial. The prosecutor denied allowing that to happen.

¶9         The next morning, the prosecutor advised defense counsel that another witness, A.B., may have seen photos of Jardines' tattoos the day before. At an in-chambers meeting, the prosecutor noted that during

_____

[2]         The limited record before us indicates neither S.M. nor A.B. had been questioned since their 2009 police interviews.

the lunch hour the previous day, A.B. had reviewed her initial police interviews on the prosecutor's laptop in a separate witness room outside the courtroom. The prosecutor was also in the room but sat on the other side of the table, social distancing, and was unable to see the laptop screen. Twice, however, the prosecutor left the room, leaving A.B. alone with the laptop. After the prosecutor came back the second time, she noticed the computer screen had "tabs" at the bottom[3] and the "tabs" linked to three photos of Jardines.[4] Later, A.B. and S.M. saw, hugged, and spoke to one another briefly in the witness room before S.M.'s testimony.

¶10          The next day, the trial court interviewed A.B., who confirmed the prosecutor's statement that she had been left alone with the laptop on two occasions. A.B. denied accessing anything or seeing any photos of Jardines' tattoos on the computer, stating she had her head down while listening to her prior recorded statements. She admitted she spoke to S.M. immediately before S.M. testified but denied giving S.M. or anyone else information about Jardines' tattoos. A.B. also admitted S.M. texted her after S.M.'s testimony concluded. Security video footage showed S.M. and A.B. left the courthouse together.

¶11          Jardines moved to dismiss the case with prejudice based on prosecutorial misconduct, arguing the prosecutor's misconduct had prejudiced him, and the only remedy was a dismissal with prejudice. He also argued the prosecutor had made herself a necessary witness, and

---

[3]          At oral argument the next day, the prosecutor avowed that shortly before noticing the "tabs" for the first time, she had turned the computer around to change the recording for A.B. and "may have bumped [the computer] and caused the thumbnails [to appear]." The prosecutor also noted that "both times when I walked in, [A.B.] had her head down. She wasn't even looking at the computer."

[4]          Jardines argues the photos in question show his tattoos. The State argues the photos "appeared in thumbnail form," "none of the potentially exposed photos even show the full tattoo," and "the tattoo in question does not appear at an angle which would make the illustration incorporated into the tattoo with [Jardines'] name visible." If the State is correct, then even had A.B. opened those photos and zoomed in on the tattoo in question, she would not have been able to describe the tattoo to S.M. so that S.M. could subsequently testify about it with the detail she provided. After observing the photos at the bottom of the laptop, the trial court concluded it was "unlikely" A.B. could have relied on the photos to convey the testified-to information about the tattoo to S.M.

alternatively, he moved to compel the prosecutor's testimony in the event his motion to dismiss with prejudice was denied. In support of his motion, he maintained the prosecutor could be called as a witness in her own case.

¶12     The State responded that the motion to dismiss was "not appropriately before the Court" because the prosecutor's "lapse in judgment" did not rise to the level of prosecutorial misconduct, and the trial should continue. The State further argued that a mistrial should not be declared, but double jeopardy should not bar a retrial if a mistrial was declared. As to Jardines' motion to compel the prosecutor's testimony, the State conceded the prosecutor could be called as a witness, but only if a compelling need could be demonstrated.

¶13     After hearing argument on the motions, the court found misconduct had occurred, but the misconduct was an unintentional "mistake" or "inadvertent error," and denied the motion to dismiss. The court then concluded a curative instruction would not be sufficient to cure the prosecutor's error and proposed a stipulation regarding the facts of the misconduct as a possible option, but Jardines rejected that proposal. The court also rejected in part the motion to compel the prosecutor's testimony, concluding "you do not call a prosecutor during a case that they're currently prosecuting," but granted the motion to compel the prosecutor's testimony in the event of a second trial.[5] Neither party suggested, and the court apparently did not consider, deferring ruling on the motion and proceeding with the trial to see whether the need for testimony by the prosecutor could be obviated.

¶14     Because there was no agreement on a lesser remedy, the court, on its own motion, ordered a mistrial over both Jardines' and the State's objections after concluding the misconduct made the prosecutor a necessary witness to impeach S.M.'s testimony and the prosecutor could not testify before the impaneled jury:

> IT IS ORDERED, *sua sponte*, declaring a mistrial. THE COURT FINDS that a manifest necessity exists. The manifest necessity is that [Jardines] has a right to question [S.M.], [A.B.], and, most specifically, the State about the photographs on the laptop, which go to the identification issue, which is a key fact in dispute in this case that impacts [Jardines'] ability to a fair trial. Jardines, while objecting to the Court's *sua*

---

[5]     The court did not formally disqualify the prosecutor, who announced she was set to retire soon anyway.

*sponte* motion for mistrial, does not agree to stipulate to any actions by the State that would eliminate the need to call the prosecutor as a witness.

**¶15**  Jardines moved to bar retrial based on double jeopardy grounds, arguing a manifest necessity did not exist to *sua sponte* declare a mistrial over his objection because the prosecutor could have testified at trial while continuing her role as prosecutor. After responsive briefing, the trial court denied the motion. Jardines then filed this special action.

## ANALYSIS

### I.  *Special Action Jurisdiction*

**¶16**  Although a special action petition is not the exclusive way for a defendant to obtain appellate review of a double jeopardy claim, *see State v. Felix*, 214 Ariz. 110, 111-12, ¶ 8 (App. 2006), it "is the appropriate vehicle for a defendant to obtain judicial appellate review of an interlocutory double jeopardy claim," *State v. Moody*, 208 Ariz. 424, 438, ¶ 22 (2004) (quoting *Nalbandian v. Superior Court*, 163 Ariz. 126, 130 (App. 1989)). "Because the Double Jeopardy Clause guarantees the right to be free from subsequent prosecution, the clause is violated by the mere commencement of retrial." *Id.* (citing *Abney v. United States*, 431 U.S. 651, 660-61 (1977)).

**¶17**  Here, special action review is Jardines' only method of relief before a second trial commences. If he is correct in his argument, the constitutional prohibition against double jeopardy would be violated by the mere commencement of a second trial. *See id.* Accordingly, we accept jurisdiction of his petition. *See* Ariz. R.P. Spec. Act. 1(a), 3(b)-(c).

### II.  *Manifest Necessity and Double Jeopardy*

**¶18**  The only issue presented is whether the trial court's *sua sponte* declaration of a mistrial over Jardines' objection bars retrial on double jeopardy grounds. Jardines argues no manifest necessity existed for the *sua sponte* declaration of a mistrial over his objection because the prosecutor could have testified about the limited facts necessary to impeach S.M. while retaining her role as the prosecutor.

**¶19**  The Fifth Amendment, which protects a criminal defendant against multiple punishments or repeated prosecutions for the same offense, applies to individual states through the Fourteenth Amendment. *State v. Solomon*, 125 Ariz. 18, 21 (1980); U.S. Const. amend. V; XIV, § 1. The Arizona Constitution also affords "double jeopardy" protection to criminal

defendants. *See* Ariz. Const. art. 2, § 10 ("No person shall . . . be twice put in jeopardy for the same offense.").

¶20 "Jeopardy attaches as soon as the jury is impaneled and sworn." *McLaughlin v. Fahringer*, 150 Ariz. 274, 277 (1986) (citing *Crist v. Bretz*, 437 U.S. 28 (1978); *Solomon*, 125 Ariz. at 21; *State v. Riggins*, 111 Ariz. 281, 283 (1974)). Once jeopardy attaches, a defendant generally may not be subject to a second trial for the same offense. *See Arizona v. Washington*, 434 U.S. 497, 505 (1978); *United States v. Jorn*, 400 U.S. 470, 479 (1971). Because jeopardy attached in this case, we must consider whether Jardines would be twice placed in jeopardy if his case proceeds to a second trial.

¶21 We review a trial court's decision to declare a mistrial and its ruling on manifest necessity for an abuse of discretion. *State v. Adamson*, 136 Ariz. 250, 263 (1983); *State v. Dickinson*, 242 Ariz. 120, 123, ¶ 12 (App. 2017). However, "[w]hether double jeopardy bars retrial is a question of law, which we review de novo." *Moody*, 208 Ariz. at 437, ¶ 18 (citing *State v. Siddle*, 202 Ariz. 512, 515, ¶ 7 (App. 2002)).

¶22 The declaration of a mistrial negates "the defendant's 'valued right to have his trial completed by a particular tribunal.'" *United States v. Dinitz*, 424 U.S. 600, 606 (1976) (citations omitted); *accord State v. Marquez*, 113 Ariz. 540, 541-42 (1976). Thus, when considering ordering a mistrial, a trial judge must be aware a defendant has a "significant interest" in deciding whether to take the case from the impaneled jury and retains primary control over the course to follow. *Jones v. Kiger*, 194 Ariz. 523, 526, ¶ 9 (App. 1999) (citations omitted).

> Indeed, even when a palpably prejudicial error has been committed a defendant may have valid personal reasons to prefer going ahead with the trial rather than beginning the entire process anew, such as a desire to minimize the embarrassment, expense, and anxiety [of a second trial]. These considerations are peculiarly within the knowledge of the defendant, not the judge, and the latter must avoid depriving the defendant of his constitutionally protected freedom of choice in the name of a paternalistic concern for his welfare.

*Id.* (quoting *Curry v. Superior Court*, 470 P.2d 345, 351 (Cal. 1970)). *See also Klinefelter v. Superior Court*, 108 Ariz. 494, 496 (1972) (recognizing a defendant may seek "to go to the first jury and, perhaps, end the dispute then and there with an acquittal" (quoting *Jorn*, 400 U.S. at 484)).

**¶23**        Arizona law generally distinguishes between mistrials declared with a defendant's consent, and mistrials declared over a defendant's objection. In most cases, a mistrial declared upon a defendant's motion or with his consent will remove any bar to re-prosecution. *Marquez*, 113 Ariz. at 542 (citations omitted). In contrast, a mistrial declared without the defendant's consent is a bar to retrial when improperly declared. *McLaughlin*, 150 Ariz. at 277 (citing *State v. Fenton*, 19 Ariz. App. 274, 276 (1973)). "In instances where the trial court declares a mistrial *sua sponte*, whether the Double Jeopardy Clause permits retrial without the defendant's consent depends on whether there is a manifest necessity for the mistrial or whether the ends of public justice will otherwise be defeated." *Id.* (citations omitted); *see also United States v. Perez*, 22 U.S. (9 Wheat) 579, 580 (1824).

**¶24**        Ordinarily, the trial court is in the best position to determine when manifest necessity demands that a mistrial be declared. *McLaughlin*, 150 Ariz. at 277 (citing *Klinefelter*, 108 Ariz. at 496). Courts have previously found such a manifest necessity when, for example, the jury was unable to reach a verdict after lengthy deliberation, when the trial judge became too ill to proceed, when newspaper coverage indicating the court had held the defendant in contempt was read by jurors and rendered impartiality suspect, and when a military court martial was discharged due to tactical necessity. *Id.* (citing *Klinefelter*, 108 Ariz. at 496-97; *Riggins*, 111 Ariz. at 284); *see also Jones*, 194 Ariz. at 526, ¶ 8 (including "when the prosecutor engaged in misconduct").

**¶25**        The burden of demonstrating a manifest necessity, however, is "a heavy one," *Arizona v. Washington*, 434 U.S. at 505, and the record here does not reveal the existence of any of the traditional examples of manifest necessity. Although the trial court found some level of misconduct had occurred in the form of an unintentional "mistake" or "inadvertent error," the court did not base its finding of manifest necessity directly on that conduct. Instead, the court explained that the manifest necessity behind the mistrial was the need for the assigned prosecutor to testify and the belief that she could not testify before the impaneled jury while acting as the assigned prosecutor.

**¶26**        In Arizona, the rules of professional conduct generally prohibit trial counsel from testifying as a witness. *See* Ariz. R. Sup. Ct. 42, ER 3.7(a). Because calling a prosecutor as a witness for the defendant inevitably confuses the distinctions between advocate and witness, and argument and testimony, the practice should be permitted only if required by a compelling need. *State v. Tuzon*, 118 Ariz. 205, 208 (1978) (citing *United*

*States v. Schwartzbaum*, 527 F.2d 249, 253 (2nd Cir. 1975)). "[A] witness is 'necessary' in this context only when the witness will offer 'relevant and material' testimony that 'could not be obtained from other witnesses.'" *State v. Georgini*, 2 CA-SA 2015-0069, 2016 WL 1298279, at *1, ¶ 2 (Ariz. App. Apr. 1, 2016) (mem. decision) (quoting *Sec. Gen. Life Ins. Co. v. Superior Court*, 149 Ariz. 332, 335 (1986)). Thus, there are rare circumstances in which a prosecutor may testify in a case that he or she actively prosecutes. *See State v. Williams*, 136 Ariz. 52, 57 (1983); *State v. Howard*, 27 Ariz. App. 339, 341 (1976) ("Although it is generally held that a prosecutor is competent to testify in a criminal case for the State even though he is engaged in the prosecution of the case, courts have generally disapproved the practice except in the extraordinary circumstances." (citation omitted)).

**¶27**      Here, it appears everyone, including the trial court, agreed the prosecutor was a necessary witness to testify in a limited capacity about facts surrounding the incident with the laptop. Assuming *arguendo* the prosecutor was a necessary witness,[6] we agree with Jardines that the prosecutor could have testified at the time of trial without being disqualified. *See Williams*, 136 Ariz. at 57; *Howard*, 27 Ariz. App. at 342.

**¶28**      The State relies on *Cottonwood Estates, Inc. v. Paradise Builders, Inc.*, 128 Ariz. 99 (1981), to argue that because the roles of an advocate and a witness are inconsistent, the assigned prosecutor should not have continued to represent the State and therefore manifest necessity existed to *sua sponte* declare a mistrial. In *Cottonwood Estates*, our supreme court denied special action relief after the trial court ruled the petitioners' attorney could not try a breach of contract action brought against his client and testify as a witness in the same proceeding. *Id.* at 101, 106. In its analysis, the court quoted *Hales v. Pittman*, 118 Ariz. 305, 313 (1978), for the proposition that "[a] fundamental rule of the American system of jurisprudence prohibits an attorney from testifying in a case he is handling." *Cottonwood Estates*, 128 Ariz. at 102. The court further noted that "[a] review of cases from other jurisdictions reveals that courts normally refuse to condone the practice of acting both as advocate and witness in the same proceeding." *Id.* (citations omitted).

---

[6]      We agree the prosecutor was potentially a necessary witness. Still, on the limited record provided by the parties, it appears most if not all her expected impeachment testimony could have been obtained through the consistent testimony of A.B., another attorney who could testify as to practices and procedures in the prosecutor's office, and possibly a forensic computer analyst.

**¶29**      We do not quarrel with those fundamental tenets. We note, however, that *Cottonwood Estates* does not stand for the proposition that an assigned prosecutor can never testify in his or her case. *Cottonwood Estates* is a civil case that involved an attorney advocating as both counsel and a witness for his client, not a criminal case in which the prosecutor is called on behalf of the defendant for impeachment purposes against her case. *See id.* at 102 n.4 ("While in a criminal proceeding there are similar considerations militating against an attorney testifying in a trial he is conducting, there are additional considerations which we are not required to weigh here."). Moreover, if our supreme court's 1981 ruling in *Cottonwood Estates* always precluded an attorney from being called as a witness, the court would not have two years later issued *Williams*, which supported, with caution, compelling the use of the prosecutor as a material witness in limited circumstances. 136 Ariz. at 56-57. Here, unlike *Cottonwood Estates*, the trial court did not disqualify the prosecutor, who could have continued to prosecute the case and been allowed to testify in a limited capacity as an impeachment witness if necessary. *See Howard*, 27 Ariz. App. at 342 ("Although a prosecutor, when he finds it necessary to testify on behalf of the prosecution, should withdraw, he has no such duty when called on behalf of the defendant." (citations omitted)). Accordingly, no manifest necessity existed for declaring a mistrial on this basis.

**¶30**      Further, even if the trial court desired not to have the prosecutor testify in a case she was prosecuting, the court did little to consider other alternatives to declaring a mistrial. Jardines indeed declined the court's suggestion of a stipulation, and the court perhaps correctly summarily rejected the idea of a possible jury instruction. However, there appears to have been no consideration as to whether other evidence might obviate any possible need for the prosecutor's testimony, as to the availability of another prosecutor with familiarity of the case to take over, or in inquiring of the jurors whether a delay in the trial until another prosecutor could take over would inconvenience them. *See McLaughlin*, 150 Ariz. at 277-78; *Jones*, 194 Ariz. at 527, ¶ 12. On this record, no manifest necessity existed for the court's *sua sponte* declaration of a mistrial.

**¶31**      Because it is possible that the prosecutor might not have to testify or could testify while continuing to prosecute the case without the need for a mistrial, no manifest necessity existed to *sua sponte* declare a mistrial against Jardines' objection. Accordingly, jeopardy has attached in this case, and a retrial is barred.

**CONCLUSION**

¶32      We accept jurisdiction of Jardines' special action petition and grant relief. We remand to the trial court with instructions to dismiss the charges with prejudice against Jardines.

**B A I L E Y**, J., dissenting:

¶33      I respectfully dissent.

¶34      While the parties do not dispute many of the facts, much of what was presented in the petition comes from the briefing and from descriptions of the facts in the motions filed in superior court, and not from the transcripts of the trial. By the time the superior court declared a mistrial, both parties had presented their opening statements, the state had elicited S.M.'s testimony on direct, S.M. answered Petitioner's voir dire questions, the court had reviewed S.M.'s police interview from 2009 and the photos referenced on the prosecutor's computer, and had also considered the testimony A.B. and the victim advocate had given outside the jury's presence. None of this record is before us.

¶35      The Petitioner had the burden to file everything from the record below necessary for this court to rule. Ariz. R.P. Spec. Act. 7(e) ("All references to the record shall be supported by an appendix of documents in the record before the trial court that are necessary for a determination of the issues raised by the petition."). Not only did Petitioner decline to file any of the relevant transcripts, but when the court inquired during oral argument, he shrugged off their relevance to the issue his petition presents. In my view, without a full record, we cannot adequately review the facts and circumstances the superior court necessarily considered when it ruled. Nor can we fully appreciate the context in which the court found a manifest necessity existed, or adequately assess the parties' arguments, including Petitioner's assertion here that he would have been in a better position if trial proceeded.

¶36      As the majority acknowledges, the general rule prohibits a prosecutor from testifying in a case he or she is prosecuting. Normally, when the prosecutor must testify, he or she must step down from the courtroom team or be disqualified. But here the majority concludes that this case falls into an exception to that rule. In my view, there is no

precedent for that conclusion. Based on what we know from the parties' briefing and the court's minute entries, the prosecutor's testimony would have addressed the core issue before the jury—the crux of the defense—the identification of Petitioner as the shooter. The prosecutor's testimony would have either impeached or bolstered the testimony of a key identification witness or witnesses. Acknowledging that uncertainty, the superior court could have properly inferred that the prosecutor would be in the untenable position of vouching for her own credibility in closing arguments. That argument would not only put the weight of the government behind the prosecutor's testimony but could result in the prosecutor vouching for an eyewitness's testimony. As such, the cases the majority cites, which weigh against the finding of a manifest necessity, do not reflect the circumstances present in the limited record before us.

¶37        I agree with the majority that a court's *sua sponte* mistrial declaration over a defense objection can be highly problematic. But it is equally rare for a court to conclude that a prosecutor must be allowed to testify on a matter central to the case. As the majority notes, when that scenario arises, and the prosecutor declines to step down, the trial judge is in the best position to determine whether a manifest necessity exists. Here, because a full transcript of the proceedings is not part of the record, I cannot conclude the court abused its discretion by *sua sponte* declaring a mistrial. *See McLaughlin v. Fahringer*, 150 Ariz. 274, 277 (1986) (citing *Klinefelter v. Superior Court*, 108 Ariz. 494, 496-97 (1972)).

¶38        I also disagree with the majority's conclusion that the trial court did "little to consider other alternatives to declaring a mistrial." *See supra* ¶ 30. Precedent provides slim guidance on how many alternatives the trial court must consider before declaring a mistrial. Here, the superior court considered a curative instruction and would have allowed a stipulation describing A.B.'s opportunity to view the prosecutor's computer if the parties had agreed to one. And unlike the cases upon which the majority relies, nothing in this record shows the availability of a second-chair or another prosecutor who could have taken over the prosecution here.

¶39        Ultimately, without the benefit of knowing everything the court considered before declaring a mistrial, I would apply the presumption that the record supports the court's finding of a manifest necessity and decline special action jurisdiction. *See Baker v. Baker*, 183 Ariz. 70, 73 (App. 1995) ("A party is responsible for making certain the record on appeal contains all transcripts or other documents necessary for us to consider the issues . . . . When a party fails to include necessary items, we

assume they would support the court's findings and conclusions.") (citation omitted); *see also* Ariz. R.P. Spec. Act. 7(e).



AMY M. WOOD • Clerk of the Court
FILED:     AA